MONTANA ᴇᴛ ᴀʟ. *v.* UNITED STATES ᴇᴛ ᴀʟ.

No. 79–1128. Argued December 3, 1980—Decided March 24, 1981

Stewart, J., delivered the opinion of the Court, in which Burger, C. J., and White, Powell, Rehnquist, and Stevens, JJ., joined. Stevens, J., filed a concurring opinion, *post*, p. 567. Blackmun, J., filed an opinion dissenting in part, in which Brennan and Marshall, JJ., joined, *post*, p. 569.

*Urban L. Roth,* Special Assistant Attorney General of Montana, argued the cause for petitioners. With him on the briefs were *Michael T. Greely,* Attorney General, *Clayton R. Herron* and *F. Woodside Wright,* Special Assistant Attorneys General, *James E. Seykora,* and *Douglas Y. Freeman.*

*Deputy Solicitor General Claiborne* argued the cause for the United States. With him on the brief were *Solicitor General McCree, Assistant Attorney General Moorman, Harlon L. Dalton, Robert L. Klarquist,* and *Steven E. Carroll.*

*Thomas J. Lynaugh* argued the cause for respondent Crow Tribe of Indians. With him on the brief was *Charles A. Hobbs.**

---

*Briefs of *amici curiae* urging reversal were filed by *Warren Spannaus,* Attorney General, *James M. Schoessler,* and *Tom D. Tobin* for the State of Minnesota et al.; by *Slade Gorton,* Attorney General, and *Timothy R. Malone,* Assistant Attorney General, for the State of Washington, joined by the Attorneys General for their respective States as follows: *Robert Corbin* of Arizona, *Robert T. Stephan* of Kansas, *John Ashcroft* of Missouri, *Paul L. Douglas* of Nebraska, and *Robert B. Hansen* of Utah;

Justice Stewart delivered the opinion of the Court.

This case concerns the sources and scope of the power of an Indian tribe to regulate hunting and fishing by non-Indians on lands within its reservation owned in fee simple by non-Indians. Relying on its purported ownership of the bed of the Big Horn River, on the treaties which created its reservation, and on its inherent power as a sovereign, the Crow Tribe of Montana claims the authority to prohibit all hunting and fishing by nonmembers of the Tribe on non-Indian property within reservation boundaries. We granted certiorari, 445 U. S. 960, to review a decision of the United States Court of Appeals for the Ninth Circuit that substantially upheld this claim.

I

The Crow Indians originated in Canada, but some three centuries ago they migrated to what is now southern Montana. In the 19th century, warfare between the Crows and several other tribes led the tribes and the United States to sign the First Treaty of Fort Laramie of 1851, in which the

and by *Paul A. Lenzini* for the International Association of Fish and Wildlife Agencies.

Briefs of *amici curiae* urging affirmance were filed by *Robert D. Dellwo* for the Coeur D'Alene Tribe of Indians et al.; and by *Barry D. Ernstoff, Steven S. Anderson, Reid Peyton Chambers, Carl V. Ullman,* and *Arthur Lazarus, Jr.,* for the Confederated Tribes of the Colville Indian Reservation et al.

A brief of *amici curiae* was filed by officials for their respective States as follows: *David H. Leroy,* Attorney General of Idaho, and *Robie G. Russell, Phillip J. Rassier, Steven V. Goddard,* and *Leslie L. Goddard,* Deputy Attorneys General; *Robert K. Corbin,* Attorney General of Arizona; *George Deukmejian,* Attorney General of California, and *R. H. Connett,* Assistant Attorney General; *Thomas J. Miller,* Attorney General of Iowa; *Robert T. Stephan,* Attorney General of Kansas; *Richard H. Bryan,* Attorney General of Nevada; *Jeff Bingaman,* Attorney General of New Mexico; *Allen I. Olson,* Attorney General of North Dakota; *Mark V. Meirhenry,* Attorney General of South Dakota; *Robert B. Hansen,* Attorney General of Utah; *Chauncey H. Browning,* Attorney General of West Virginia; and *Bronson C. La Follette,* Attorney General of Wisconsin.

signatory tribes acknowledged various designated lands as their respective territories. See 11 Stat. 749 and 2 C. Kappler, Indian Affairs: Laws and Treaties 594 (1904) (hereinafter Kappler). The treaty identified approximately 38.5 million acres as Crow territory and, in Article 5, specified that, by making the treaty, the tribes did not "surrender the privilege of hunting, fishing, or passing over" any of the lands in dispute. In 1868, the Second Treaty of Fort Laramie established a Crow Reservation of roughly 8 million acres, including land through which the Big Horn River flows. 15 Stat. 649. By Article II of the treaty, the United States agreed that the reservation "shall be . . . set apart for the absolute and undisturbed use and occupation" of the Crow Tribe, and that no non-Indians except agents of the Government "shall ever be permitted to pass over, settle upon, or reside in" the reservation.

Several subsequent Acts of Congress reduced the reservation to slightly fewer than 2.3 million acres. See 22 Stat. 42 (1882); § 31, 26 Stat. 1039–1040 (1891); ch. 1624, 33 Stat. 352 (1904); ch. 890, 50 Stat. 884 (1937). In addition, the General Allotment Act of 1887, ch. 119, 24 Stat. 388, and the Crow Allotment Act of 1920, 41 Stat. 751, authorized the issuance of patents in fee to individual Indian allottees within the reservation. Under these Acts, an allottee could alienate his land to a non-Indian after holding it for 25 years. Today, roughly 52 percent of the reservation is allotted to members of the Tribe and held by the United States in trust for them, 17 percent is held in trust for the Tribe itself, and approximately 28 percent is held in fee by non-Indians. The State of Montana owns in fee simple 2 percent of the reservation, the United States less than 1 percent.

Since the 1920's, the State of Montana has stocked the waters of the reservation with fish, and the construction of a dam by the United States made trout fishing in the Big Horn River possible. The reservation also contains game, some of it stocked by the State. Since the 1950's, the Crow Tribal

Council has passed several resolutions respecting hunting and fishing on the reservation, including Resolution No. 74–05, the occasion for this lawsuit. That resolution prohibits hunting and fishing within the reservation by anyone who is not a member of the Tribe. The State of Montana, however, has continued to assert its authority to regulate hunting and fishing by non-Indians within the reservation.

On October 9, 1975, proceeding in its own right and as fiduciary for the Tribe, the United States endeavored to resolve the conflict between the Tribe and the State by filing the present lawsuit. The plaintiff sought (1) a declaratory judgment quieting title to the bed of the Big Horn River in the United States as trustee for the Tribe, (2) a declaratory judgment establishing that the Tribe and the United States have sole authority to regulate hunting and fishing within the reservation, and (3) an injunction requiring Montana to secure the permission of the Tribe before issuing hunting or fishing licenses for use within the reservation.

The District Court denied the relief sought. 457 F. Supp. 599. In determining the ownership of the river, the court invoked the presumption that the United States does not intend to divest itself of its sovereign rights in navigable waters and reasoned that here, as in *United States* v. *Holt State Bank,* 270 U. S. 49, the language and circumstances of the relevant treaties were insufficient to rebut the presumption. The court thus concluded that the bed and banks of the river had remained in the ownership of the United States until they passed to Montana on its admission to the Union. As to the dispute over the regulation of hunting and fishing, the court found that "[i]mplicit in the Supreme Court's decision in *Oliphant* [v. *Suquamish Indian Tribe,* 435 U. S. 191,] is the recognition that Indian tribes do not have the power, nor do they have the authority, to regulate non-Indians unless so granted by an act of Congress." 457 F. Supp., at 609. Because no treaty or Act of Congress gave the Tribe authority to regulate hunting or fishing by non-Indians, the court held

that the Tribe could not exercise such authority except by granting or withholding authority to trespass on tribal or Indian land. All other authority to regulate non-Indian hunting and fishing resided concurrently in the State of Montana and, under 18 U. S. C. § 1165 (which makes it a federal offense to trespass on Indian land to hunt or fish without permission), the United States.

The Court of Appeals reversed the judgment of the District Court. 604 F. 2d 1162. Relying on its opinion in *United States* v. *Finch,* 548 F. 2d 822, vacated on other grounds, 433 U. S. 676, the appellate court held that, pursuant to the treaty of 1868, the bed and banks of the river were held by the United States in trust for the Tribe. Relying on the treaties of 1851 and 1868, the court held that the Tribe could regulate hunting and fishing within the reservation by nonmembers, although the court noted that the Tribe could not impose criminal sanctions on those nonmembers. The court also held, however, that the two Allotment Acts implicitly deprived the Tribe of the authority to prohibit hunting and fishing on fee lands by resident nonmember owners of those lands. Finally, the court held that nonmembers permitted by the Tribe to hunt or fish within the reservation remained subject to Montana's fish and game laws.

II

The respondents seek to establish a substantial part of their claim of power to control hunting and fishing on the reservation by asking us to recognize their title to the bed of the Big Horn River.[1] The question is whether the United States

---

[1] According to the respondents, the Crow Tribe's interest in restricting hunting and fishing on the reservation focuses almost entirely on sports fishing and duck hunting in the waters and on the surface of the Big Horn River. The parties, the District Court, and the Court of Appeals have all assumed that ownership of the riverbed will largely determine the power to control these activities. Moreover, although the complaint in this case sought to quiet title only to the bed of the Big Horn River, we note the concession of the United States that if the bed of the river passed to

conveyed beneficial ownership of the riverbed to the Crow Tribe by the treaties of 1851 or 1868, and therefore continues to hold the land in trust for the use and benefit of the Tribe, or whether the United States retained ownership of the riverbed as public land which then passed to the State of Montana upon its admission to the Union. *Choctaw Nation* v. *Oklahoma*, 397 U. S. 620, 627–628.

Though the owners of land riparian to *nonnavigable* streams may own the adjacent riverbed, conveyance by the United States of land riparian to a *navigable* river carries no interest in the riverbed. *Packer* v. *Bird*, 137 U. S. 661, 672; *Railroad Co.* v. *Schurmeir*, 7 Wall. 272, 289; 33 U. S. C. § 10; 43 U. S. C. § 931. Rather, the ownership of land under navigable waters is an incident of sovereignty. *Martin* v. *Waddell*, 16 Pet. 367, 409–411. As a general principle, the Federal Government holds such lands in trust for future States, to be granted to such States when they enter the Union and assume sovereignty on an "equal footing" with the established States. *Pollard's Lessee* v. *Hagan*, 3 How. 212, 222–223, 229. After a State enters the Union, title to the land is governed by state law. The State's power over the beds of navigable waters remains subject to only one limitation: the paramount power of the United States to ensure that such waters remain free to interstate and foreign commerce. *United States* v. *Oregon*, 295 U. S. 1, 14. It is now established, however, that Congress may sometimes convey lands below the high-water mark of a navigable water,

> "[and so defeat the title of a new State,] in order to perform international obligations, or to effect the improvement of such lands for the promotion and convenience of commerce with foreign nations and among the several States, or to carry out other public purposes appropriate to the objects for which the United States hold the Territory." *Shively* v. *Bowlby*, 152 U. S. 1, 48.

---

Montana upon its admission to the Union, the State at the same time acquired ownership of the banks of the river as well.

But because control over the property underlying navigable waters is so strongly identified with the sovereign power of government, *United States* v. *Oregon, supra,* at 14, it will not be held that the United States has conveyed such land except because of "some international duty or public exigency." *United States* v. *Holt State Bank,* 270 U. S., at 55. See also *Shively* v. *Bowlby, supra,* at 48. A court deciding a question of title to the bed of a navigable water must, therefore, begin with a strong presumption against conveyance by the United States, *United States* v. *Oregon, supra,* at 14, and must not infer such a conveyance "unless the intention was definitely declared or otherwise made plain," *United States* v. *Holt State Bank, supra,* at 55, or was rendered "in clear and especial words," *Martin* v. *Waddell, supra,* at 411, or "unless the claim confirmed in terms embraces the land under the waters of the stream," *Packer* v. *Bird, supra,* at 672.[2]

In *United States* v. *Holt State Bank, supra,* this Court applied these principles to reject an Indian Tribe's claim of title to the bed of a navigable lake. The lake lay wholly within the boundaries of the Red Lake Indian Reservation, which had been created by treaties entered into before Minnesota joined the Union. In these treaties the United States promised to "set apart and withhold from sale, for the use of" the Chippewas, a large tract of land, Treaty of Sept. 30, 1854, 10 Stat. 1109, and to convey "a sufficient quantity of land for the permanent homes" of the Indians, Treaty of Feb. 22, 1855, 10 Stat. 1165. See *Minnesota* v. *Hitchcock,* 185 U. S. 373, 389.[3] The Court concluded that there was nothing in the treaties "which even approaches a grant of rights in lands underlying navigable waters; nor anything evincing a pur-

---

[2] Congress was, of course, aware of this presumption once it was established by this Court. See *Rosebud Sioux Tribe* v. *Kneip,* 430 U. S. 584, 588.

[3] The *Hitchcock* decision expressly stated that the Red Lake Reservation was "a reservation within the accepted meaning of the term." 185 U. S., at 389.

pose to depart from the established policy . . . of treating such lands as held for the benefit of the future State." *United States* v. *Holt State Bank,* 270 U. S., at 58–59. Rather, "[t]he effect of what was done was to reserve in a general way for the continued occupation of the Indians what remained of their aboriginal territory." *Id.,* at 58.

The Crow treaties in this case, like the Chippewa treaties in *Holt State Bank,* fail to overcome the established presumption that the beds of navigable waters remain in trust for future States and pass to the new States when they assume sovereignty. The 1851 treaty did not by its terms formally convey any land to the Indians at all, but instead chiefly represented a covenant among several tribes which recognized specific boundaries for their respective territories. Treaty of Fort Laramie, 1851, Art. 5, 2 Kappler 594–595. It referred to hunting and fishing only insofar as it said that the Crow Indians "do not surrender the privilege of hunting, fishing, or passing over any of the tracts of country heretofore described," a statement that had no bearing on ownership of the riverbed. By contrast, the 1868 treaty did expressly convey land to the Crow Tribe. Article II of the treaty described the reservation land in detail [4] and stated that such land would be "set apart for the absolute and undisturbed use and occupation of the Indians herein named . . . ." Second Treaty of Fort Laramie, May 7, 1868, Art. II, 15 Stat. 650. The treaty then stated:

> "[T]he United States now solemnly agrees that no persons, except those herein designated and authorized to

---

[4] "[C]ommencing where the 107th degree of longitude west of Greenwich crosses the south boundary of Montana Territory; thence north along said 107th meridian to the mid-channel of the Yellowstone River; thence up said mid-channel of the Yellowstone to the point where it crosses the said southern boundary of Montana, being the 45th degree of north latitude; and thence east along said parallel of latitude to the place of beginning . . . ." Second Treaty of Fort Laramie, May 7, 1868, Art. II, 15 Stat. 650.

> do so, and except such officers, agents, and employés of the Government as may be authorized to enter upon Indian reservations in discharge of duties enjoined by law, shall ever be permitted to pass over, settle upon, or reside in the territory described in this article for the use of said Indians . . . ." *Ibid.*

Whatever property rights the language of the 1868 treaty created, however, its language is not strong enough to overcome the presumption against the sovereign's conveyance of the riverbed. The treaty in no way expressly referred to the riverbed, *Packer* v. *Bird*, 137 U. S., at 672, nor was an intention to convey the riverbed expressed in "clear and especial words," *Martin* v. *Waddell*, 16 Pet., at 411, or "definitely declared or otherwise made very plain," *United States* v. *Holt State Bank*, 270 U. S., at 55. Rather, as in *Holt*, "[t]he effect of what was done was to reserve in a general way for the continued occupation of the Indians what remained of their aboriginal territory." *Id.*, at 58.

Though Article 2 gave the Crow Indians the sole right to use and occupy the reserved land, and, implicitly, the power to exclude others from it, the respondents' reliance on that provision simply begs the question of the precise extent of the conveyed lands to which this exclusivity attaches. The mere fact that the bed of a navigable water lies within the boundaries described in the treaty does not make the riverbed part of the conveyed land, especially when there is no express reference to the riverbed that might overcome the presumption against its conveyance. In the Court of Appeals' *Finch* decision, on which recognition of the Crow Tribe's title to the riverbed rested in this case, that court construed the language of exclusivity in the 1868 treaty as granting to the Indians all the lands, including the riverbed, within the described boundaries. *United States* v. *Finch*, 548 F. 2d, at 829. Such a construction, however, cannot survive examina-

tion. As the Court of Appeals recognized, *ibid.,* and as the respondents concede, the United States retains a navigational easement in the navigable waters lying within the described boundaries for the benefit of the public, regardless of who owns the riverbed. Therefore, such phrases in the 1868 treaty as "absolute and undisturbed use and occupation" and "no persons, except those herein designated . . . shall ever be permitted," whatever they seem to mean literally, do not give the Indians the exclusive right to occupy all the territory within the described boundaries. Thus, even if exclusivity were the same as ownership, the treaty language establishing this "right of exclusivity" could not have the meaning that the Court of Appeals ascribed to it.[5]

---

[5] In one recent case, *Choctaw Nation* v. *Oklahoma,* 397 U. S. 620, this Court did construe a reservation grant as including the bed of a navigable water, and the respondents argue that this case resembles *Choctaw Nation* more than it resembles the established line of cases to which *Choctaw Nation* is a singular exception. But the finding of a conveyance of the riverbed in *Choctaw Nation* was based on very peculiar circumstances not present in this case.

Those circumstances arose from the unusual history of the treaties there at issue, a history which formed an important basis of the decision. *Id.,* at 622–628. Immediately after the Revolutionary War, the United States had signed treaties of peace and protection with the Cherokee and Choctaw Tribes, reserving them lands in Georgia and Mississippi. In succeeding years, the United States bought large areas of land from the Indians to make room for white settlers who were encroaching on tribal lands, but the Government signed new treaties guaranteeing that the Indians could live in peace on those lands not ceded. The United States soon betrayed that promise. It proposed that the Tribes be relocated in a newly acquired part of the Arkansas Territory, but the new territory was soon overrun by white settlers, and through a series of new cession agreements the Indians were forced to relocate farther and farther west. Ultimately, most of the Tribes' members refused to leave their eastern lands, doubting the reliability of the Government's promises of the new western land, but Georgia and Mississippi, anxious for the relocation westward so they could assert jurisdiction over the Indian lands, purported to abolish the Tribes and distribute the tribal lands. The Choctaws and Cherokees

Moreover, even though the establishment of an Indian reservation can be an "appropriate public purpose" within the meaning of *Shively* v. *Bowlby,* 152 U. S., at 48, justifying a congressional conveyance of a riverbed, see, *e. g., Alaska Pacific Fisheries* v. *United States,* 248 U. S. 78, 85, the situation of the Crow Indians at the time of the treaties presented no "public exigency" which would have required Congress to depart from its policy of reserving ownership of beds under navigable waters for the future States. See *Shively* v. *Bowlby, supra,* at 48. As the record in this case shows, at the time of the treaty the Crows were a nomadic tribe dependent chiefly on buffalo, and fishing was not important to their diet or way of life. 1 App. 74. Cf., *Alaska Pacific Fisheries* v. *United States, supra,* at 88; *Skokomish Indian Tribe* v. *France,* 320 F. 2d 205, 212 (CA9).

For these reasons, we conclude that title to the bed of the Big Horn River passed to the State of Montana upon its

finally signed new treaties with the United States aimed at rectifying their past suffering at the hands of the Federal Government and the States.

Under the Choctaw treaty, the United States promised to convey new lands west of the Arkansas Territory in fee simple, and also pledged that "no Territory or State shall ever have a right to pass laws for the government of the Choctaw Nation . . . and that no part of the land granted to them shall ever be embraced in any Territory or State." Treaty of Dancing Rabbit Creek, Sept. 27, 1830, 7 Stat. 333–334, quoted in *Choctaw Nation* v. *Oklahoma,* 397 U. S., at 625. In 1835, the Cherokees signed a treaty containing similar provisions granting reservation lands in fee simple and promising that the tribal lands would not become part of any State or Territory. *Id.,* at 626. In concluding that the United States had intended to convey the riverbed to the Tribes before the admission of Oklahoma to the Union, the *Choctaw* Court relied on these circumstances surrounding the treaties and placed special emphasis on the Government's promise that the reserved lands would never become part of any State. *Id.,* at 634–635. Neither the special historical origins of the Choctaw and Cherokee treaties nor the crucial provisions granting Indian lands in fee simple and promising freedom from state jurisdiction in those treaties have any counterparts in the terms and circumstances of the Crow treaties of 1851 and 1868.

admission into the Union, and that the Court of Appeals was in error in holding otherwise.

## III

Though the parties in this case have raised broad questions about the power of the Tribe to regulate hunting and fishing by non-Indians on the reservation, the regulatory issue before us is a narrow one. The Court of Appeals held that the Tribe may prohibit nonmembers from hunting or fishing on land belonging to the Tribe or held by the United States in trust for the Tribe, 604 F. 2d, at 1165–1166, and with this holding we can readily agree. We also agree with the Court of Appeals that if the Tribe permits nonmembers to fish or hunt on such lands, it may condition their entry by charging a fee or establishing bag and creel limits. *Ibid.* What remains is the question of the power of the Tribe to regulate non-Indian fishing and hunting on reservation land owned in fee by nonmembers of the Tribe. The Court of Appeals held that, with respect to fee-patented lands, the Tribe may regulate, but may not prohibit, hunting and fishing by nonmember resident owners or by those, such as tenants or employees, whose occupancy is authorized by the owners. *Id.,* at 1169. The court further held that the Tribe may totally prohibit hunting and fishing on lands within the reservation owned by non-Indians who do not occupy that land. *Ibid.*

The Court of Appeals found two sources for this tribal regulatory power: the Crow treaties, "augmented" by 18 U. S. C. § 1165, and "inherent" Indian sovereignty. We believe that neither source supports the court's conclusion.

### A

The purposes of the 1851 treaty were to assure safe passage for settlers across the lands of various Indian Tribes; to compensate the Tribes for the loss of buffalo, other game animals, timber, and forage; to delineate tribal boundaries; to promote intertribal peace; and to establish a way of iden-

tifying Indians who committed depredations against non-Indians. As noted earlier, the treaty did not even create a reservation, although it did designate tribal lands. See *Crow Tribe* v. *United States*. 151 Ct. Cl. 281, 285–286, 289, 292–293, 284 F. 2d 361, 364, 366, 368. Only Article 5 of that treaty referred to hunting and fishing, and it merely provided that the eight signatory tribes "do not surrender the privilege of hunting, fishing, or passing over any of the tracts of country heretofore described." 2 Kappler 595.[6] The treaty nowhere suggested that Congress intended to grant authority to the Crow Tribe to regulate hunting and fishing by nonmembers on nonmember lands. Indeed, the Court of Appeals acknowledged that after the treaty was signed non-Indians, as well as members of other Indian tribes, undoubtedly hunted and fished within the treaty-designated territory of the Crows. 604 F. 2d, at 1167.

The 1868 Fort Laramie Treaty, 15 Stat. 649, reduced the size of the Crow territory designated by the 1851 treaty. Article II of the treaty established a reservation for the Crow Tribe, and provided that it be "set apart for the *absolute and undisturbed use and occupation* of the Indians herein named, and for such other friendly tribes or individual Indians as from time to time they may be willing, with the consent of the United States, to admit amongst them . . . ," (emphasis added) and that "the United States now solemnly agrees that no persons, except those herein designated and authorized so to do . . . shall ever be permitted to pass over, settle upon, or reside in the territory described in this article for the use of said Indians . . . ." The treaty, therefore, obligated the United States to prohibit most non-Indians from residing on or passing through reservation lands used and occupied by the Tribe, and, thereby, arguably conferred upon the Tribe

---

[6] The complaint in this case did not allege that non-Indian hunting and fishing on reservation lands has impaired this privilege.

the authority to control fishing and hunting on those lands.[7] But that authority could only extend to land on which the Tribe exercises "absolute and undisturbed use and occupation." And it is clear that the quantity of such land was substantially reduced by the allotment and alienation of tribal lands as a result of the passage of the General Allotment Act of 1887, 24 Stat. 388, as amended, 25 U. S. C. § 331 *et seq.*, and the Crow Allotment Act of 1920, 41 Stat. 751.[8] If the 1868 treaty created tribal power to restrict or prohibit non-Indian hunting and fishing on the reservation, that power cannot apply to lands held in fee by non-Indians.[9]

---

[7] Article IV of the treaty addressed hunting rights specifically. But that Article referred only to "unoccupied lands of the United States," *viz.*, lands outside the reservation boundaries, and is accordingly not relevant here.

[8] The 1920 Crow Allotment Act was one of the special Allotment Acts Congress passed from time to time pursuant to the policy underlying the General Allotment Act. See S. Rep. No. 219, 66th Cong., 1st Sess., 5 (1919). The Senate Committee Report on the Crow Allotment bill stated that it "is in accordance with the policy to which Congress gave its adherence many years ago, and which found expression in the [General Allotment Act]." *Ibid.*

[9] The Court of Appeals discussed the effect of the Allotment Acts as follows:

"While neither of these Acts, nor any other to which our attention has been called, explicitly qualifies the Tribe's rights over hunting and fishing, it defies reason to suppose that Congress intended that non-members who reside on fee patent lands could hunt and fish thereon only by consent of the Tribe. So far as the record of this case reveals, no efforts to exclude completely non-members of the Crow Tribe from hunting and fishing within the reservation were being made by the Crow Tribe at the time of enactment of the Allotment Acts." 604 F. 2d 1162, 1168 (footnote omitted).

But nothing in the Allotment Acts supports the view of the Court of Appeals that the Tribe could nevertheless bar hunting and fishing by non-resident fee owners. The policy of the Acts was the eventual assimilation of the Indian population, *Organized Village of Kake* v. *Egan*, 369 U. S. 60, 72, and the "gradual extinction of Indian reservations and Indian titles." *Draper* v. *United States*, 164 U. S. 240, 246. The Secretary of

In *Puyallup Tribe* v. *Washington Game Dept.*, 433 U. S. 165 (*Puyallup III*), the relevant treaty included language virtually identical to that in the 1868 Treaty of Fort Laramie. The Puyallup Reservation was to be "set apart, and, so far

the Interior and the Commissioner of Indian Affairs repeatedly emphasized that the allotment policy was designed to eventually eliminate tribal relations. See, *e. g.*, Secretary of the Interior Ann. Rep., vol. 1, pp. 25–28 (1885); Secretary of the Interior Ann. Rep., vol. 1, p. 4 (1886); Commissioner of Indian Affairs Ann. Rep., vol. 1, pp. IV–X (1887); Secretary of the Interior Ann. Rep., vol. 1, pp. XXIX–XXXII (1888); Commissioner of Indian Affairs Ann. Rep. 3–4 (1889); Commissioner of Indian Affairs Ann. Rep. VI, XXXIX (1890); Commissioner of Indian Affairs Ann. Rep., vol. 1, pp. 3–9, 26 (1891); Commissioner of Indian Affairs Ann. Rep. 5 (1892); Secretary of the Interior Ann. Rep., vol. 1, p. IV (1894). And throughout the congressional debates on the subject of allotment, it was assumed that the "civilization" of the Indian population was to be accomplished, in part, by the dissolution of tribal relations. See, *e. g.*, 11 Cong. Rec. 779 (Sen. Vest), 782 (Sen. Coke), 783–784 (Sen. Saunders), 875 (Sens. Morgan and Hoar), 881 (Sen. Brown), 905 (Sen. Butler), 939 (Sen. Teller), 1003 (Sen. Morgan), 1028 (Sen. Hoar), 1064, 1065 (Sen. Plumb), 1067 (Sen. Williams) (1881).

There is simply no suggestion in the legislative history that Congress intended that the non-Indians who would settle upon alienated allotted lands would be subject to tribal regulatory authority. Indeed, throughout the congressional debates, allotment of Indian land was consistently equated with the dissolution of tribal affairs and jurisdiction. See, *e. g.*, *id.*, at 785 (Sen. Morgan), 875 (Sen. Hoar), 876 (Sen. Morgan), 878 (Sens. Hoar and Coke), 881 (Sen. Brown), 908 (Sen. Call), 939 (Sen. Teller), 1028 (Sen. Hoar), 1067 (Sens. Edmunds and Williams). It defies common sense to suppose that Congress would intend that non-Indians purchasing allotted lands would become subject to tribal jurisdiction when an avowed purpose of the allotment policy was the ultimate destruction of tribal government. And it is hardly likely that Congress could have imagined that the purpose of peaceful assimilation could be advanced if feeholders could be excluded from fishing or hunting on their acquired property.

The policy of allotment and sale of surplus reservation land was, of course, repudiated in 1934 by the Indian Reorganization Act, 48 Stat. 984, 25 U. S. C. § 461 *et seq.* But what is relevant in this case is the effect of the land alienation occasioned by that policy on Indian treaty rights tied to Indian use and occupation of reservation land.

as necessary, surveyed and marked out for their exclusive use . . . [and no] white man [was to] be permitted to reside upon the same without permission of the tribe . . . ." See *id.*, at 174. The Puyallup Tribe argued that those words amounted to a grant of authority to fish free of state interference. But this Court rejected that argument, finding, in part, that it "clashe[d] with the subsequent history of the reservation . . . ," *ibid.*, notably two Acts of Congress under which the Puyallups alienated, in fee simple, the great majority of the lands in the reservation, including all the land abutting the Puyallup River. Thus, "[n]either the Tribe nor its members continue to hold Puyallup River fishing grounds for their 'exclusive use.'" *Ibid.* *Puyallup III* indicates, therefore, that treaty rights with respect to reservation lands must be read in light of the subsequent alienation of those lands. Accordingly, the language of the 1868 treaty provides no support for tribal authority to regulate hunting and fishing on land owned by non-Indians.

The Court of Appeals also held that the federal trespass statute, 18 U. S. C. § 1165, somehow "augmented" the Tribe's regulatory powers over non-Indian land. 604 F. 2d, at 1167. If anything, however, that statute suggests the absence of such authority, since Congress deliberately excluded fee-patented lands from the statute's scope. The statute provides:

> "Whoever, without lawful authority or permission, willfully and knowingly goes upon any land that belongs to any Indian or Indian tribe, band, or group and either are held by the United States in trust or are subject to a restriction against alienation imposed by the United States, or upon any lands of the United States that are reserved for Indian use, for the purpose of hunting, trapping, or fishing thereon, or for the removal of game, peltries, or fish therefrom, shall be fined . . . ."

The statute is thus limited to lands owned by Indians, held in trust by the United States for Indians, or reserved for use

by Indians.[10] If Congress had wished to extend tribal juris-
diction to lands owned by non-Indians, it could easily have
done so by incorporating in § 1165 the definition of "Indian
country" in 18 U. S. C. § 1151: "all land within the limits
of any Indian reservation under the jurisdiction of the United
States Government, notwithstanding the issuance of any pat-
ent, and including rights-of-way running through the reserva-
tion." Indeed, a Subcommittee of the House Committee on
the Judiciary proposed that this be done. But the Depart-
ment of the Interior recommended against doing so in a letter
dated May 23, 1958. The Department pointed out that a
previous congressional Report, H. R. Rep. No. 2593, 85th
Cong., 2d Sess. (1958),[11] had made clear that the bill con-
tained no implication that it would apply to land other than
that held or controlled by Indians or the United States.[12]

---

[10] See *United States* v. *Bouchard*, 464 F. Supp. 1316, 1336 (WD Wis.);
*United States* v. *Pollmann*, 364 F. Supp. 995 (Mont.).

[11] House Report No. 2593 stated that the purpose of the bill that became
18 U. S. C. § 1165 was to make it unlawful to enter Indian land to hunt,
trap, or fish without the consent of the individual Indian or tribe:

"Indian property owners should have the same protection as other prop-
erty owners, for example, a private hunting club may keep nonmembers
off its game lands or it may issue a permit for a fee. One who comes on
such lands without permission may be prosecuted under State law but a
non-Indian trespasser on an Indian reservation enjoys immunity.

. . . . .

"Non-Indians are not subject to the jurisdiction of Indian courts and
cannot be tried in Indian courts on trespass charges. Further, there are
no Federal laws which can be invoked against trespassers." H. R. Rep.
No. 2593, 85th Cong., 2d Sess., at 2.

[12] Subsequent Reports in the House and Senate, H. R. Rep. No. 625,
86th Cong., 1st Sess. (1959); S. Rep. No. 1686, 86th Cong., 2d Sess. (1960),
also refer to "Indian lands" and "Indian property owners" rather than
"Indian country." In *Oliphant* v. *Suquamish Indian Tribe*, 435 U. S. 191,
this Court referred to S. Rep. No. 1686, which stated that "the legislation
[18 U. S. C. § 1165] will give to the Indian tribes and to *individual Indian
owners* certain rights that now exist as to others, and fills a gap in the

The Committee on the Judiciary then adopted the present language, which does not reach fee-patented lands within the boundaries of an Indian reservation.

## B

Beyond relying on the Crow treaties and 18 U. S. C. § 1165 as source for the Tribe's power to regulate non-Indian hunting and fishing on non-Indian lands within the reservation, the Court of Appeals also identified that power as an incident of the inherent sovereignty of the Tribe over the entire Crow Reservation. 604 F. 2d, at 1170. But "inherent sovereignty" is not so broad as to support the application of Resolution No. 74–05 to non-Indian lands.

This Court most recently reviewed the principles of inherent sovereignty in *United States* v. *Wheeler*, 435 U. S. 313. In that case, noting that Indian tribes are "unique aggregations possessing attributes of sovereignty over both their members and their territory," *id.*, at 323, the Court upheld the power of a tribe to punish tribal members who violate tribal criminal laws. But the Court was careful to note that, through their original incorporation into the United States as well as through specific treaties and statutes, the Indian tribes have lost many of the attributes of sovereignty. *Id.*,

present law for the protection of *their property.*" 435 U. S., at 206. (Emphasis added.)

Before the Court of Appeals decision, several other courts interpreted § 1165 to be confined to lands owned by Indians, or held in trust for their benefit. *State* v. *Baker,* 464 F. Supp. 1377 (WD Wis.); *United States* v. *Bouchard,* 464 F. Supp. 1316 (WD Wis.); *United States* v. *Pollmann, supra; Donahue* v. *California Justice Court,* 15 Cal. App. 3d 557, 93 Cal. Rptr. 310. Cf. *United States* v. *Sanford,* 547 F. 2d 1085, 1089 (CA9) (holding that § 1165 was designed to prevent encroachments on Indian lands, rejecting the argument that § 1165 makes illegal the unauthorized killing of wildlife on an Indian reservation, and noting that "the application of Montana game laws to the activities of non-Indians on Indian reservations does not interfere with tribal self-government on reservations").

at 326. The Court distinguished between those inherent powers retained by the tribes and those divested:

> "The areas in which such implicit divestiture of sovereignty has been held to have occurred are those involving *the relations between an Indian tribe and nonmembers of the tribe. . . .*
>
> These limitations rest on the fact that the dependent status of Indian tribes within our territorial jurisdiction is necessarily inconsistent with their freedom independently *to determine their external relations.* But the powers of self-government, including the power to prescribe and enforce internal criminal laws, are of a different type. They involve *only the relations among members of a tribe.* Thus, they are not such powers as would necessarily be lost by virtue of a tribe's dependent status."
> *Ibid.* (Emphasis added.)

Thus, in addition to the power to punish tribal offenders, the Indian tribes retain their inherent power to determine tribal membership, to regulate domestic relations among members, and to prescribe rules of inheritance for members. *Id.,* at 322, n. 18. But exercise of tribal power beyond what is necessary to protect tribal self-government or to control internal relations is inconsistent with the dependent status of the tribes, and so cannot survive without express congressional delegation. *Mescalero Apache Tribe* v. *Jones,* 411 U. S. 145, 148; *Williams* v. *Lee,* 358 U. S. 217, 219–220; *United States* v. *Kagama,* 118 U. S. 375, 381–382; see *McClanahan* v. *Arizona State Tax Comm'n,* 411 U. S. 164, 171. Since regulation of hunting and fishing by nonmembers of a tribe on lands no longer owned by the tribe bears no clear relationship to tribal self-government or internal relations,[13]

[13] Any argument that Resolution No. 74–05 is necessary to Crow tribal self-government is refuted by the findings of the District Court that the State of Montana has traditionally exercised "near exclusive" jurisdiction over hunting and fishing on fee lands within the reservation, and that the

the general principles of retained inherent sovereignty did not authorize the Crow Tribe to adopt Resolution No. 74–05.

The Court recently applied these general principles in *Oliphant* v. *Suquamish Indian Tribe,* 435 U. S. 191, rejecting a tribal claim of inherent sovereign authority to exercise criminal jurisdiction over non-Indians. Stressing that Indian tribes cannot exercise power inconsistent with their diminished status as sovereigns, the Court quoted Justice Johnson's words in his concurrence in *Fletcher* v. *Peck,* 6 Cranch 87, 147—the first Indian case to reach this Court—that the Indian tribes have lost any "right of governing every person within their limits except themselves." 435 U. S., at 209. Though *Oliphant* only determined inherent tribal authority in criminal matters,[14] the principles on which it relied support the general proposition that the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe. To be sure, Indian tribes retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians on their reservations, even on non-Indian fee lands. A tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements. *Williams* v. *Lee, supra,* at 223; *Morris* v. *Hitchcock,* 194 U. S.

---

parties to this case had accommodated themselves to the state regulation. 457 F. Supp. 599, 610. The Court of Appeals left these findings unaltered and indeed implictly reaffirmed them, adding that the record reveals no attempts by the Tribe at the time of the Crow Allotment Act to forbid non-Indian hunting and fishing on reservation lands. 604 F. 2d, at 1168, and n. 11A.

[14] By denying the Suquamish Tribe criminal jurisdiction over non-Indians, however, the *Oliphant* case would seriously restrict the ability of a tribe to enforce any purported regulation of non-Indian hunters and fishermen. Moreover, a tribe would not be able to rely for enforcement on the federal criminal trespass statute, 18 U. S. C. § 1165, since that statute does not apply to fee patented lands. See *supra,* at 561–563, and nn. 10–12.

384; *Buster* v. *Wright,* 135 F. 947, 950 (CA8); see *Washington* v. *Confederated Tribes of Colville Indian Reservation,* 447 U. S. 134, 152–154. A tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe. See *Fisher* v. *District Court,* 424 U. S. 382, 386; *Williams* v. *Lee, supra,* at 220; *Montana Catholic Missions* v. *Missoula County,* 200 U. S. 118, 128–129; *Thomas* v. *Gay,* 169 U. S. 264, 273.[15]

No such circumstances, however, are involved in this case. Non-Indian hunters and fishermen on non-Indian fee land do not enter any agreements or dealings with the Crow Tribe so as to subject themselves to tribal civil jurisdiction. And nothing in this case suggests that such non-Indian hunting and fishing so threaten the Tribe's political or economic security as to justify tribal regulation. The complaint in the District Court did not allege that non-Indian hunting and fishing on fee lands imperil the subsistence or welfare of the Tribe.[16] Furthermore, the District Court made express findings, left unaltered by the Court of Appeals, that the Crow Tribe has traditionally accommodated itself to the State's "near exclusive" regulation of hunting and fishing on fee lands within the reservation. 457 F. Supp., at 609–610. And the District Court found that Montana's statutory and regulatory scheme does not prevent the Crow Tribe from limiting

[15] As a corollary, this Court has held that Indian tribes retain rights to river waters necessary to make their reservations livable. *Arizona* v. *California,* 373 U. S. 546, 599.

[16] Similarly, the complaint did not allege that the State has abdicated or abused its responsibility for protecting and managing wildlife, has established its season, bag, or creel limits in such a way as to impair the Crow Indians' treaty rights to fish or hunt, or has imposed less stringent hunting and fishing regulations within the reservation than in other parts of the State. Cf. *United States* v. *Washington,* 384 F. Supp. 312, 410–411 (WD Wash.), aff'd, 520 F. 2d 676 (CA9).

or forbidding non-Indian hunting and fishing on lands still owned by or held in trust for the Tribe or its members. *Id.,* at 609.

## IV

For the reasons stated in this opinion, the judgment of the Court of Appeals is reversed, and the case is remanded to that court for further proceedings.

*It is so ordered.*

JUSTICE STEVENS, concurring.

In its opinion in *Choctaw Nation* v. *Oklahoma,* 397 U. S. 620, the Court repeatedly pointed out that ambiguities in the governing treaties should be resolved in favor of the Indian tribes.[1] That emphasis on a rule of construction favoring the tribes might arguably be read as having been intended to indicate that the strong presumption against dispositions

---

[1] The Court described this rule of construction, and explained the reasoning underlying it:

"[T]hese treaties are not to be considered as exercises in ordinary conveyancing. The Indian Nations did not seek out the United States and agree upon an exchange of lands in an arm's-length transaction. Rather, treaties were imposed upon them and they had no choice but to consent. As a consequence, this Court has often held that treaties with the Indians must be interpreted as they would have understood them, see, *e. g., Jones* v. *Meehan,* 175 U. S. 1, 11 (1899), and any doubtful expressions in them should be resolved in the Indians' favor. See *Alaska Pacific Fisheries* v. *United States,* 248 U. S. 78, 89 (1918). Indeed, the Treaty of Dancing Rabbit Creek itself provides that 'in the construction of this Treaty wherever well founded doubt shall arise, it shall be construed most favourably towards the Choctaws.' 7 Stat. 336." 397 U. S., at 630–631.

The Court went on to base its decision on this rule of construction:

"[T]he court in [*United States* v.] *Holt State Bank* [270 U. S. 49] itself examined the circumstances in detail and concluded 'the reservation was not intended to effect such a disposal.' 270 U. S., at 58. We think that the similar conclusion of the Court of Appeals in this case was in error, given the circumstances of the treaty grants and the countervailing rule of construction that well-founded doubt should be resolved in petitioners' favor." *Id.,* at 634.

by the United States of land under navigable waters in the territories is not applicable to Indian reservations. However, for the following reasons, I do not so read the *Choctaw Nation* opinion.

In *United States* v. *Holt State Bank,* 270 U. S. 49, the Court unanimously and unequivocally had held that the presumption applied to Indian reservations. Although the references to *Holt State Bank* in the Court's opinion in *Choctaw Nation* can hardly be characterized as enthusiastic, see 397 U. S., at 634, the *Choctaw Nation* opinion did not purport to abandon or to modify the rule of *Holt State Bank.* Indeed, Justice Douglas, while joining the opinion of the Court, wrote a separate opinion to explain why he had concluded that the *Choctaw Nation* record supplied the "exceptional circumstances" required under the *Holt State Bank* rule.[2]

Only seven Justices participated in the *Choctaw Nation* decision.[3] JUSTICE WHITE, joined by THE CHIEF JUSTICE and Justice Black in dissent, relied heavily on the *Holt State Bank* line of authority, see 397 U. S., at 645–648, and, as I noted above, Justice Douglas, in his concurrence, also appears to have accepted the *Holt State Bank* rule. Because only four Justices, including Justice Douglas, joined the Court's opinion, I do not believe it should be read as having made a substantial change in settled law.

[2] Before reviewing the history of the Cherokee and Choctaw Reservations, Justice Douglas wrote:

"[W]hile the United States holds a domain as a territory, it may convey away the right to the bed of a navigable river, not retaining that property for transfer to a future State, though as stated in *Holt State Bank* that purpose is 'not lightly to be inferred, and should not be regarded as intended unless the intention was definitely declared or otherwise made very plain.' 270 U. S., at 55. Such exceptional circumstances are present here." 397 U. S., at 639.

[3] When *Choctaw Nation* was decided, the Court consisted of only eight active Justices. Justice Harlan did not participate in the consideration or decision of *Choctaw Nation.*

Finally, it is significant for me that JUSTICE STEWART, who joined the *Choctaw Nation* opinion, is the author of the Court's opinion today. Just as he is, I am satisfied that the circumstances of the *Choctaw Nation* case differ significantly from the circumstances of this case. Whether I would have voted differently in the two cases if I had been a Member of the Court when *Choctaw Nation* was decided is a question I cannot answer. I am, however, convinced that unless the Court is to create a broad exception for Indian reservations, the *Holt State Bank* presumption is controlling. I therefore join the Court's opinion.

JUSTICE BLACKMUN, with whom JUSTICE BRENNAN and JUSTICE MARSHALL join, dissenting in part.

Only two years ago, this Court reaffirmed that the terms of a treaty between the United States and an Indian tribe must be construed " 'in the sense in which they would naturally be understood by the Indians.' " *Washington* v. *Fishing Vessel Assn.*, 443 U. S. 658, 676 (1979), quoting from *Jones* v. *Meehan*, 175 U. S. 1, 11 (1899). In holding today that the bed of the Big Horn River passed to the State of Montana upon its admission to the Union, the Court disregards this settled rule of statutory construction. Because I believe that the United States intended, and the Crow Nation understood, that the bed of the Big Horn was to belong to the Crow Indians, I dissent from so much of the Court's opinion as holds otherwise.[1]

## I

As in any case involving the construction of a treaty, it is necessary at the outset to determine what the parties in-

---

[1] While the complaint in this case sought to quiet title only to the bed of the Big Horn River, see *ante,* at 550, n. 1, I think it plain that if the bed of the river was reserved to the Crow Indians before statehood, so also were the banks up to the high-water mark.

tended. *Washington* v. *Fishing Vessel Assn.*, 443 U. S., at 675. With respect to an Indian treaty, the Court has said that "the United States, as the party with the presumptively superior negotiating skills and superior knowledge of the language in which the treaty is recorded, has a responsibility to avoid taking advantage of the other side." *Id.*, at 675–676. Obviously, this rule is applicable here. But before determining what the Crow Indians must have understood the Treaties of Fort Laramie to mean, it is appropriate to ask what the United States intended, for our inquiry need go no further if the United States meant to convey the bed of the Big Horn River to the Indians.

The Court concedes that the establishment of an Indian reservation can be an "appropriate public purpose" justifying a congressional conveyance of a riverbed. *Ante,* at 556. It holds, however, that no such public purpose or exigency could have existed here, since at the time of the Fort Laramie Treaties the Crow were a nomadic tribe dependent chiefly upon buffalo, and fishing was not important to their diet or way of life. *Ibid.* The factual premise upon which the Court bases its conclusion is open to serious question: while the District Court found that fish were not "a central part of the Crow diet," 457 F. Supp. 599, 602 (Mont. 1978), there was evidence at trial that the Crow ate fish both as a supplement to their buffalo diet and as a substitute for meat in time of scarcity.[2]

Even if it were true that fishing was not important to the Crow Indians at the time the Fort Laramie Treaties came into being, it does not necessarily follow that there was no public purpose or exigency that could have led Congress to

---

[2] See 1 App. 39–40 (testimony of Joe Medicine Crow, Tribal Historian). See also *id.*, at 90, 97 (testimony of Henry Old Coyote). Thus, while one historian has stated that "I have never met a reference to eating of fish" by the Crow Indians, R. Lowie, The Crow Indians 72 (1935), it is clear that such references do exist. See 457 F. Supp., at 602. See also n. 7, *infra.*

convey the riverbed to the Crow. Indeed, history informs us that the very opposite was true. In negotiating these treaties, the United States was actuated by two somewhat conflicting purposes: the desire to provide for the Crow Indians, and the desire to obtain the cession of all Crow territory not within the ultimate reservation's boundaries. Retention of ownership of the riverbed for the benefit of the future State of Montana would have been inconsistent with each of these purposes.

First: It was the intent of the United States that the Crow Indians be converted from a nomadic, hunting tribe to a settled, agricultural people.[3] The Treaty of Fort Laramie of Sept. 17, 1851, see 11 Stat. 749, and 2 C. Kappler, Indian Affairs: Laws and Treaties 594 (1904) (hereinafter Kappler), was precipitated by the depletion of game, timber, and forage by the constantly increasing number of settlers who crossed the lands of the Plains Indians on their way to California. Aggrieved by these depredations, the Indians had opposed that passage, sometimes by force.[4] In order to ensure safe passage for the settlers, the United States in 1851 called together at Fort Laramie eight Indian Nations, including the Crow. The pronouncement made at that time by the United States Commissioner emphasized the Government's concern over the destruction of the game upon which the Indians depended.[5] The treaty's Art. 5, which set speci-

---

[3] See generally *United States* v. *Sioux Nation of Indians,* 448 U. S. 371, 380, n. 11 (1980) (discussing federal reservation policy).

[4] The history of the events leading up to the Fort Laramie Treaty of 1851 is recounted in detail in *Crow Tribe of Indians* v. *United States,* 151 Ct. Cl. 281, 284 F. 2d 361 (1960), cert. denied, 366 U. S. 924 (1961); *Crow Nation* v. *United States,* 81 Ct. Cl. 238 (1935); and *Fort Berthold Indians* v. *United States,* 71 Ct. Cl. 308 (1930).

[5] According to an account published in the Saint Louis Republican, Oct. 26, 1851, Treaty Commissioner Mitchell stated:

"The ears of your Great Father are always open to the complaints of his Red Children. He has heard and is aware that your buffalo and game

fied boundaries for the Indian Nations, explicitly provided that the signatory tribes "do not surrender the privilege of hunting, *fishing,* or passing over any of the tracts" described in the treaty, 2 Kappler, at 595 (emphasis added), and, further, its Art. 7 stated that the United States would provide an annuity in the form of "provisions, merchandise, domestic animals, and agricultural implements." *Ibid.*

The intent of the United States to provide alternative means of subsistence for the Plains Indians is demonstrated even more clearly by the subsequent Fort Laramie Treaty of May 7, 1868, between the United States and the Crow Nation. 15 Stat. 649. United States Commissioner Taylor, who met with the Crow Indians in 1867, had acknowledged to them that the game upon which they relied was "fast disappearing," and had stated that the United States proposed to furnish them with "homes and cattle, to enable you to begin to raise a supply or stock with which to support your families when the game was disappeared." [6] Proceedings of the Great Peace Commission of 1867–1868, pp. 86–87 (Institute for the Development of Indian Law (1975)) (hereinafter Proceedings). Given this clear recognition by the United States that the traditional mainstay of the Crow Indians' diet was disappearing, it is inconceivable that the United States intended by the 1868 treaty to deprive the Crow of "potential control over a source of food on their

---

are driven off and your grass and timber consumed by the opening of roads and the passing of emigrants through your countries. For these losses he desires to compensate you." Quoted in *Crow Tribe of Indians* v. *United States,* 151 Ct. Cl., at 290, 284 F. 2d, at 366.

The same concern was expressed in internal communications of the Government. See, *e. g., id.,* at 287–288, 284 F. 2d, at 365 (letter of W. Medill, Commissioner of Indian Affairs to the Secretary of the Interior).

[6] The 1868 treaty provided that members of the Crow Tribe who commenced farming would be allotted land and given agricultural supplies; it also provided that subsistence rations for a period of four years would be supplied to every Indian who agreed to settle on the reservation. See Arts. VI, VIII, and IX of the treaty, 15 Stat. 650–652.

reservation." [7] *United States* v. *Finch,* 548 F. 2d 822, 832 (CA9 1976), vacated on other grounds, 433 U. S. 676 (1977). See *Alaska Pacific Fisheries* v. *United States,* 248 U. S. 78 (1918).[8]

Second: The establishment of the Crow Reservation was

---

[7] It is significant that in 1873 the United States Commissioners who sought to negotiate a further diminishment of the Crow Reservation were instructed by the very Act of Mar. 3, 1873, ch. 321, 17 Stat. 626, that "if there is upon such reservation a locality where fishing could be valuable to the Indians, [they should] include the same [in the diminished reservation] if practicable . . . ."

That those fishing rights would have been valuable to the Crow Indians is suggested by the statement of Chief Blackfoot at the 1867 Fort Laramie Conference:

"There is plenty of buffalo, deer, elk, and antelope in my country. There is plenty of beaver in all the streams. *There is plenty of fish too.* I never yet heard of any of the Crow Nation dying of starvation. I know that the game is fast decreasing, and whenever it gets scarce, I will tell my Great Father. That will be time enough to go farming." Proceedings, at 91. (Emphasis added.)

Edwin Thompson Denig, a white fur trader who resided in Crow territory from approximately 1833 until 1856, also remarked:

"Every creek and river teems with beaver, and good fish and fowl can be had at any stream in the proper season." E. Denig, Of the Crow Nation 21 (1980).

[8] In *Alaska Pacific Fisheries,* the United States sued to enjoin a commercial fishing company from maintaining a fish trap in navigable waters off the Annette Islands in Alaska, which had been set aside for the Metlakahtla Indians. The lower courts granted the relief sought, and this Court affirmed. The Court noted: "That Congress had power to make the reservation inclusive of the adjacent waters and submerged land as well as the upland needs little more than statement." 248 U. S., at 87. This was because the reservation was a setting aside of public property "for a recognized public purpose—that of safe-guarding and advancing a dependent Indian people dwelling within the United States." *Id.,* at 88. The Court observed that "[t]he Indians naturally looked on the fishing grounds as part of the islands," and it found further support for its conclusion "in the general rule that statutes passed for the benefit of dependent Indian tribes or communities are to be liberally construed, doubtful expressions being resolved in favor of the Indians." *Id.,* at 89.

necessitated by the same "public purpose" or "exigency" that led to the creation of the Choctaw and Cherokee Reservations discussed in *Choctaw Nation* v. *Oklahoma,* 397 U. S. 620 (1970). In both cases, Congress responded to pressure for Indian land by establishing reservations in return for the Indians' relinquishment of their claims to other territories.[9] Just as the Choctaws and the Cherokees received their reservation in fee simple " 'to inure to them while they shall exist as a nation and live on it,' " *id.,* at 625, so the Crow were assured in 1867 that they would receive "a tract of your country as a home for yourselves and children forever, upon which your great Father will not permit the white man to trespass." Proceedings, at 86. Indeed, during the negotiations of both the 1851 and 1868 Treaties of Fort Laramie the United States repeatedly referred to the land as belonging to the Indians, and the treaties reflect this understanding.[10]

---

[9] That the Choctaws and Cherokees were forced to leave their original homeland entirely, while the Crow were forced to accept repeated diminishments of their territory, does not distinguish *Choctaw Nation* from this case; indeed, if anything, that distinction suggests that the Crow Indians would have had an even greater expectancy than did the Choctaws and Cherokees that the rivers encompassed by their reservation would continue to belong to them. The "public purpose" behind the creation of these reservations in each case was the same: "to provide room for the increasing numbers of new settlers who were encroaching upon Indian lands during their westward migrations." *Choctaw Nation* v. *Oklahoma,* 397 U. S., at 623. While the Fort Laramie Treaty of 1851 may have been designed primarily to assure safe passage for settlers crossing Indian lands, by 1868 settlers and miners were remaining in Montana. See N. Plummer, Crow Indians 109–114 (1974). Accordingly, whereas the signatory tribes, by Art. 5 of the 1851 treaty, did not "abandon or prejudice any rights or claims they may have to other lands," see 2 Kappler, at 595, by Art. II of the 1868 treaty the Crow Indians "relinquish[ed] all title, claims, or rights in and to any portion of the territory of the United States, except such as is embraced within the [reservation] limits aforesaid." 15 Stat. 650.

[10] See *Crow Tribe of Indians* v. *United States,* 151 Ct. Cl., at 288–291, 284 F. 2d, at 365–367; Proceedings, at 86. The Court suggests that the

Finally, like the Cherokee Reservation, see 397 U. S., at 628, the Crow Reservation created by Art. II of the 1868 treaty consisted of "one undivided tract of land described merely by exterior metes and bounds." 15 Stat. 650.

Since essentially the same "public purpose" led to the creation of both reservations, it is highly appropriate that the analysis of *Choctaw Nation* be applied in this case. As the State of Montana does here, the State of Oklahoma in *Choctaw Nation* claimed a riverbed that was surrounded on both sides by lands granted to an Indian tribe. This Court in *Choctaw Nation* found Oklahoma's claim to be "at the least strained," and held that all the land inside the reservation's exterior metes and bounds, *including the riverbed,* "seems clearly encompassed within the grant," even though no mention had been made of the bed. 397 U. S., at 628. The Court found that the "natural inference" to be drawn from the grants to the Choctaws and Cherokees was that "all the land within their metes and bounds was conveyed, including the banks and bed of rivers." *Id.,* at 634. See also *Donnelly* v. *United States,* 228 U. S. 243, 259 (1913). The

___

1851 treaty was simply "a covenant among several tribes which recognized specific boundaries for their respective territories." *Ante,* at 553. But this interpretation of the treaty consistently has been rejected by the Court of Claims, which has held that the treaty recognized title in the signatory Indian Nations. See *Crow Tribe of Indians,* 151 Ct. Cl., at 291, 284 F. 2d, at 367; *Crow Nation* v. *United States,* 81 Ct. Cl., at 271–272; *Fort Berthold Indians* v. *United States,* 71 Ct. Cl. 308 (1930). Further, the Court's interpretation is contrary to the analysis of the 1851 treaty made in *Shoshone Indians* v. *United States,* 324 U. S. 335, 349 (1945) ("the circumstances surrounding the execution of the Fort Laramie treaty [of 1851] indicate a purpose to recognize the Indian title to the lands described").

In any event, as the Court concedes, *ante,* at 553, it is beyond dispute that the 1868 treaty set apart a reservation "for the absolute and undisturbed use and occupation" of the Crow Indians. Cf. *United States* v. *Sioux Nation of Indians,* 448 U. S., at 374–376 (discussing the similar provisions of the Fort Laramie Treaty of April 29, 1868, 15 Stat. 635, between the United States and the Sioux Nation).

576

Court offers no plausible explanation for its failure to draw the same "natural inference" here.[11]

In *Choctaw Nation,* the State of Oklahoma also laid claim to a portion of the Arkansas River at the border of the Indian reservation. The Court's analysis of that claim lends weight to the conclusion that the bed of the Big Horn belongs to the Crow Indians. Interpreting the treaty language setting the boundary of the Cherokee Reservation "down the main channel of the Arkansas river," the *Choctaw* Court noted that such language repeatedly has been held to convey title to the midpoint of the channel, relying on *Brewer-Elliott Oil & Gas Co.* v. *United States,* 260 U. S. 77 (1922).[12] 397 U. S., at 631–633. Here, Art. II of the 1868 Treaty of

---

[11] As noted above, neither the "special historical origins" of the Choctaw and Cherokee treaties, nor the provisions of those treaties granting Indian lands in fee simple, serve to distinguish this case from *Choctaw Nation.* Equally unpersuasive is the suggestion that in *Choctaw* the Court placed "special emphasis on the Government's promise that the reserved lands would never become part of any State." *Ante,* at 556, n. 5. Rather than placing "special emphasis" on this promise, the *Choctaw* Court indicated only that the promise reinforced the conclusion that the Court drew from an analysis of the language of conveyance contained in the treaties. 397 U. S., at 635.

[12] In *Brewer-Elliott,* the United States established a reservation for the Osage Indians that was bounded on one side "by . . . the main channel of the Arkansas river." 260 U. S., at 81. This Court held that the portion of the Arkansas River in question was nonnavigable and that "the title of the Osages as granted certainly included the bed of the river as far as the main channel, because the words of the grant *expressly carry the title to that line." Id.,* at 87. (Emphasis added.) While the Court purported to reserve the question whether vesting ownership of the riverbed in the Osage Indians would have constituted an appropriate "public purpose" within the meaning of *Shively* v. *Bowlby,* 152 U. S. 1 (1894), if the stream had been navigable, that question essentially had been resolved four years earlier in *Alaska Pacific Fisheries.* See n. 8, *supra.* In any event, *Choctaw Nation* clearly holds, and the Court concedes, *ante,* at 556, that the establishment of an Indian reservation can be an "appropriate public purpose" within the meaning of *Shively* v. *Bowlby.*

Fort Laramie established the boundary of the Crow Reservation as running in part up the "mid-channel of the Yellowstone river." 15 Stat. 650. Thus, under *Brewer-Elliott* and *Choctaw Nation,* it is clear that the United States intended to grant the Crow the bed of the Yellowstone to the midpoint of the channel; it follows *a fortiori* that it was the intention of the United States to grant the Crow Indians the bed of that portion of the Big Horn that was totally encompassed by the reservation.[13]

## II

But even assuming, *arguendo,* that the United States intended to retain title to the bed of the Big Horn River for the benefit of the future State of Montana, it defies common sense to suggest that the Crow Indians would have so understood the terms of the Fort Laramie Treaties.[14] In negotiating the 1851 treaty, the United States repeatedly referred to the territories at issue as "your country," as "your land," and as "your territory." See *Crow Tribe of Indians* v. *United States,* 151 Ct. Cl. 281, 287–291, 284 F. 2d 361, 364–367 (1960). Further, in Art. 3 of the treaty itself the Government undertook to protect the signatory tribes "against the commission of all depredations by the people of the said United States," and to compensate the tribes for any damages

---

[13] Later events confirm this conclusion. In 1891, the Crow Indians made a further cession of territory. See Act of Mar. 3, 1891, § 31, 26 Stat. 1040. This cession was bounded in part by the Big Horn River. Significantly, the Act described the boundary of the cession as the "mid-channel" of the river; that language necessarily indicates that the Crow owned the entire bed of the Big Horn prior to the cession, and that by the Act they were ceding half the bed in the affected stretch of the river, while retaining the other half in that stretch and the whole of the bed in the portion of the river that remained surrounded by their lands.

[14] Counsel for the State of Montana acknowledged at oral argument that the Crow Indians did not understand the meaning of the equal-footing doctrine at the times they entered into the Fort Laramie Treaties. Tr. of Oral Arg. 13–14.

they suffered thereby; in return, in Art. 2, the United States received the right to build roads and military posts on the Indians' territories. 2 Kappler, at 594.

The history of the treaty of 1868 is even more telling. By this time, whites were no longer simply passing through the Indian territories on their way to California. Instead, in the words of United States Commissioner Taylor, who addressed the Crow representatives gathered at Fort Laramie in 1867:

> "We learn that valuable mines have been discovered in *your country* which in some instances are taken possession of by the whites. We learn that roads are laid out and travelled through *your land,* that settlements have been made upon *your lands,* that your game is being driven away and is fast disappearing. We know also that the white people are rapidly increasing and are taking possession of and occupying all the valuable lands. Under these circumstances we are sent by the great Father and the Great Council in Washington to arrange some plan to relieve you, as far as possible, from the bad consequences of this state of things and to protect you from future difficulties." Proceedings, at 86. (Emphasis added.)

It is hardly credible that the Crow Indians who heard this declaration would have understood that the United States meant to retain the ownership of the riverbed that ran through the very heart of the land the United States promised to set aside for the Indians and their children "forever." Indeed, Chief Blackfoot, when addressed by Commissioner Taylor, responded: "The Crows used to own all this Country *including all the rivers of the West." Id.,* at 88. (Emphasis added.) The conclusion is inescapable that the Crow Indians understood that they retained the ownership of at least those rivers within the metes and bounds of the reservation

granted them.[15] This understanding could only have been strengthened by the reference in the 1868 treaty to the mid-channel of the Yellowstone River as part of the boundary of the reservation; the most likely interpretation that the Crow could have placed on that reference is that half the Yellowstone belonged to them, and it is likely that they accordingly deduced that all of the rivers within the boundary of the reservation belonged to them.

In fact, any other conclusion would lead to absurd results. Gold had been discovered in Montana in 1858, and sluicing operations had begun on a stream in western Montana in 1862; hundreds of prospectors were lured there by this news, and some penetrated Crow territory. N. Plummer, Crow Indians 109–110 (1974). As noted, Commissioner Taylor remarked in 1867 that whites were mining in Indian territory, and he specifically indicated that the United States intended to protect the Indians from such intrusions. Yet the result reached by the Court today indicates that Montana or its licensees would have been free to enter upon the Big Horn River for the purpose of removing minerals from its bed or banks; further, in the Court's view, they remain free to do so in the future. The Court's answer to a similar claim made by the State of Oklahoma in *Choctaw Nation* is fully applicable here: "We do not believe that [the Indians] would have considered that they could have been precluded from exercising these basic ownership rights to the river bed, and we think it very unlikely that the United States intended otherwise." [16] 397 U. S., at 635.

---

[15] Statements made by Chief Blackfoot during the treaty negotiations of 1873 buttress this conclusion. See, *e. g.*, 3 App. 136 ("The Great Spirit made these mountains and rivers for us, and all this land"); *id.*, at 171 ("On the other side of the river all those streams belong to the Crows").

[16] The Court suggests that the fact the United States retained a navigational easement in the Big Horn River indicates that the 1868 treaty

580

## III

In *Choctaw Nation,* the Court was confronted with a claim almost identical to that made by the State of Montana in this case. There, as here, the argument was made that the silence of the treaties in question with regard to the ownership of the disputed riverbeds was fatal to the Indians' case. In both cases, the state claimant placed its principal reliance on this Court's statement in *United States* v. *Holt State Bank,* 270 U. S. 49, 55 (1926), that the conveyance of a riverbed "should not be regarded as intended unless the intention was definitely declared or otherwise made very plain." The Court flatly rejected this argument in *Choctaw Nation,* pointing out that "nothing in the *Holt State Bank* case or in the policy underlying its rule of construction . . . requires that courts blind themselves to the circumstances of the grant in determining the intent of the grantor." [17] 397 U. S., at

---

could not have granted the Crow the exclusive right to occupy all the territory within the reservation boundary. *Ante,* at 555. But the retention of a navigational easement obviously does not preclude a finding that the United States meant to convey the land beneath the navigable water. See, *e. g., Choctaw Nation, supra; Alaska Pacific Fisheries, supra.*

[17] The Court's reliance on *Holt State Bank* is misplaced for other reasons as well. At issue in that case was the bed of Mud Lake, a once navigable body of water in the Red Lake Reservation in Minnesota. Prior to the case, most of the reservation, and all the tracts surrounding the lake, had been "relinquished and ceded" by the Indians and sold off to homesteaders. 270 U. S., at 52–53. No such circumstances are present here. See n. 18, *infra.*

Moreover, a critical distinction between this case and *Holt State Bank* arises from the questionable status of the Red Lake Reservation before Minnesota became a State. The Court in *Holt State Bank* concluded that in the treaties preceding statehood there had been, with respect to the Red Lake area—unlike other areas—"no formal setting apart of what was not ceded, nor any affirmative declaration of the rights of the Indians therein . . . ." 270 U. S., at 58 (footnote omitted). Thus, *Holt State Bank* clearly does not control a case, such as this one, in which, prior to

634. Since I believe that the Court has so blinded itself today, I respectfully dissent from its holding that the State of Montana has title to the bed of the Big Horn River.[18]

statehood, the United States set apart by formal treaty a reservation that included navigable waters. See n. 10, *supra*.

Finally, the Court fails to recognize that it is *Holt State Bank,* not *Choctaw Nation,* that stands as "a singular exception" to this Court's established line of cases involving claims to submerged lands adjacent to or encompassed by Indian reservations. See *Choctaw Nation; Brewer-Elliott; Alaska Pacific Fisheries; Donnelly* v. *United States,* all *supra.*

[18] I agree with the Court's resolution of the question of the power of the Tribe to regulate non-Indian fishing and hunting on reservation land owned in fee by nonmembers of the Tribe. I note only that nothing in the Court's disposition of that issue is inconsistent with the conclusion that the bed of the Big Horn River belongs to the Crow Indians. There is no suggestion that any parcels alienated in consequence of the Indian General Allotment Act of 1887, 24 Stat. 388, or the Crow Allotment Act of 1920, 41 Stat. 751, included portions of the bed of the Big Horn River. Further, the situation here is wholly unlike that in *Puyallup Tribe* v. *Washington Game Dept.,* 433 U. S. 165 (1977). As the Court recognizes, *ante,* at 561, the Puyallups alienated, in fee simple, the great majority of the lands in the reservation, including all the land abutting the Puyallup River. 433 U. S., at 173–174, and n. 11. This is not such a case.