*Lita MANYGOATS*
Petitioner-Appellee
*vs.*
*ATKINSON TRADING COMPANY, Inc.*
*d/b/a Cameron Trading Post*
Respondent-Appellant

In the Supreme Court of the Navajo Nation

No. SC-CV-62-00

August 12, 2003

Anna Marie Johnson, Esq., Window Rock, Navajo Nation (Arizona), C. Benson Hufford, Esq., and Alexandra Shouffe, Esq., Flagstaff, Arizona, for Appellee.

James B. Collins, Esq., Farmington, New Mexico, and William J. Darling, Albuquerque, New Mexico, for Appellant.

Before YAZZIE, Chief Justice, and FERGUSON, Associate Justice.

Opinion delivered by FERGUSON, Associate Justice.

This case involves the termination of employee Lita Manygoats ("Manygoats"), a member of the Navajo Nation, by her employer, Cameron Trading Post ("Cameron"), a non-Indian company located on the Navajo Nation. Cameron appeals from Orders issued by the Navajo Nation Labor Commission ("Labor Commission") on remand from a prior decision of this Court, *Manygoats v. Cameron Trading Post*, 8 Nav. R. 3 (Nav. Sup. Ct. 2000) [hereinafter *Manygoats (I)*]. This is Cameron's second appeal. After careful review of the extensive record before us, we affirm the Orders of the Labor Commission.

## I. FACTS & PROCEDURAL HISTORY

Cameron Trading Post ("Cameron") consists of a hotel, convenience store, curio/gift shop, restaurant and gas station located near Cameron, Navajo Nation (Arizona), on non-Indian fee land within the exterior boundaries of the Navajo Nation. It sells Navajo jewelry, rugs and other arts and crafts to both Navajo and non-Navajo customers.

The vast majority of Cameron's employees - between 70% and 90% depending on the season - are Navajo. Manygoats was hired as a clerk and cashier in March 1995. A few months later, upon arriving to work one day, she found that her shifts for the rest of that week had been crossed out. When she asked her manager about this, he told her that she had been fired, but he did not give her any specific reasons for her termination. After she insisted on proper written notification, the manager wrote on a piece of scrap paper: "Lita George

[Manygoats] was terminated on 8-10-95 for violation of company policies."[1]

Manygoats filed a Complaint with the Office of Navajo Labor Relations ("ONLR") claiming, among other things, that she was fired without just cause and that she had not been given proper written notification citing reasons for her termination. After the ONLR gave Cameron notice of Manygoats' Complaint, Cameron sent her a letter listing six alleged reasons for her termination.

The case went before the Labor Commission; it held that Cameron did not have just cause to fire Manygoats and that its original notice was improper because it failed to cite the specific reasons for the termination, as required by the Navajo Preference in Employment Act ("NPEA"), 15 N.N.C. § 604(B) (8). It awarded Manygoats back-pay and attorneys' fees, and imposed a civil fine on Cameron for its violations of the NPEA. Cameron appealed the Labor Commission's decision to this Court.

In *Manygoats (I)*, we held that the Navajo Nation has regulatory and adjudicatory civil jurisdiction over Cameron's employment practices, that Cameron does not have standing to assert the equal protection rights of hypothetical non-Navajo employee-claimants and that while the NPEA's allocation of the burden of proof does not violate the right of employer-respondents to due process, the 'clear and convincing' standard of proof does. Accordingly, we lowered the standard of proof to a 'preponderance of the evidence' and vacated the award of back-pay and attorneys' fees (which we noted were to be calculated with reference to Navajo Nation attorneys' rates). We also vacated the civil fine on the grounds that its imposition was procedurally defective, and remanded the case to the Labor Commission for further proceedings.

On remand, the Labor Commission applied the 'preponderance of the evidence' standard to the record, which included transcripts' of two days of evidentiary hearings. It concluded that Cameron still did not carry its burden of proving that it either had just cause to terminate Manygoats, or had given her proper written notification. The Labor Commission again ordered Cameron to pay Manygoats back-pay, costs, and attorneys' fees, which it adjusted to reflect

---

1 In its first appeal to this Court, Cameron claimed that:

    1. it did have just cause to terminate Manygoats' employment,

    2. it had given Manygoats proper written notification,

    3. that both the award of attorneys' fees and the imposition of the civil fine were unjustified,

    4. the Navajo Nation lacked regulatory and adjudicatory jurisdiction over its employment practices,

    5. the NPEA violated the right of non-Navajo employees to equal protection, and

    6. the NPEA's allocation of the burden of proof, and its 'clear and convincing' standard of proof, violated the right of employer-respondents to due process.

prevailing Navajo Nation rates. The Labor Commission repealed the civil fine, however, because it had not made a finding that Cameron had violated the NPEA intentionally.

Cameron then brought the present (and its second) appeal. Cameron repeats its previous claims that (1) the Navajo Nation does not have jurisdiction over Cameron's employment practices; (2) the NPEA violates the right of non-Navajo employees to equal protection; and (3) the NPEA's allocation of the burden of proof violates the right of employers to due process.

In addition, Cameron makes the new claims that on remand, the Labor Commission violated its right to due process by allegedly reviewing the record without the required quorum and by not holding another hearing or accepting more briefs. Cameron also claims that the Labor Commission erred in finding that it had violated the NPEA's termination provision, 15 N.N.C. §604(B)(8), and in awarding Manygoats costs and attorneys' fees.

## II. ISSUES AND ANALYSIS

The issues before the Court are the following:

1. Whether the Navajo Nation has civil regulatory and adjudicatory jurisdiction over the employment practices of Cameron Trading Post, a non-Indian business employing Navajo workers and operating on non-Indian fee land within the Navajo Nation?

2. Whether Cameron has standing to assert an equal protection claim on behalf of hypothetical non-Navajo employee-claimants?

3. Whether the NPEA's allocation of the burden of proof violates the right of employer-respondents to due process?

4. Whether the Labor Commission violated Cameron"s right to due process on remand by (a) allegedly deciding the case without a quorum, and (b) declining to hold another evidentiary hearing or to accept the submission of additional briefs?

5. Whether the Labor Commission erred when it held that Cameron did not prove that it did not violate the NPEA's termination provision, 15 N.N.C § 604(B)(8)?

6. Whether the Labor Commission erred in awarding attorneys' fees and costs to Manygoats?[2]

### A. JURISDICTION

In *Manygoats (I)*, we noted that the Treaty of 1868 between the United States and the Navajo Nation recognized the inherent sovereignty of the Navajo Nation, and,

2  We ruled on the first three issues in *Manygoats (I)*. Our rulings on those issues are the law of the case. However, for the sake of clarity, we restate our reasoning with respect to those issues here, addressing recent developments in the case law where necessary.

with it, the inherent authority of the Nation to exercise civil jurisdiction on all land within the exterior boundaries of its territory. 8 Nav. R. at 17. In *Montana v. United States*, the U.S. Supreme Court held that, as a general rule, inherent tribal sovereignty does not extend to the exercise of civil jurisdiction over non-Indians on non-Indian fee land within the tribe's territory. 450 U.S. 544, 565 (1982). However, the Court recognized two broad exceptions to this general rule:

> ▮A tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases or other arrangements. [2] A tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe. *Id.* (internal citations omitted).

The Navajo Nation's regulation of Cameron's employment practices easily falls within the first exception, for Cameron has clearly entered consensual relationships with members of the Navajo Nation through employment contracts, by employing tribal members to provide services in exchange for mutually agreed upon wages. Its employment practices are, therefore, subject to the Navajo Nation's employment regulations.

Cameron argues that its employment of Navajo workers is not "consensual" for two reasons: (1) it is prohibited by Title VII of the Civil Rights Act of 1964 from discriminating on the basis of race or national origin; since a majority of job applicants are Navajo, it must employ Navajo workers; and (2) even if it were not prohibited by federal law from discriminating against Navajos, it would not be able to avoid hiring them; there are simply not enough non-Navajos in the area to permit Cameron not to employ Navajo workers. Cameron argues that for both of these reasons, it is not voluntarily entering into employment relationships with Navajo Nation members, and the relationships therefore cannot be considered "consensual." Cameron implies that it would not hire Navajo workers if it could avoid doing so.

Cameron's argument is disingenuous, for it clearly benefits from the feel of authenticity that Navajo workers bring to the trading post. As we noted in *Manygoats (I)*, Cameron describes itself on its website as "one of the last authentic trading posts . . . [and] continues to serve as an active trade and cultural center blending modern commerce with traditional Indian trading customs." 8 Nav. R. at 14. And Joe Atkinson, the President of Atkinson Trading Company, Inc., is quoted as saying:

> What makes Cameron special is not only the fine weavings, baskets and bead work, it's the ambiance. Here you're not just told about the people, their traditions and what trading post life is like. You experience it! This gives the works of art meaning and brings them to life.

*Id.* Interacting with the Navajos who work at Cameron is what makes it possible for people who visit the trading post to feel like they are *experiencing* "the people, their traditions and what trading post life is like." Cameron's contention that it is somehow *forced* by law and practical realities to hire Navajos contradicts the fact that it recognizes how important Navajo workers are to the success of its business.

More importantly, from the point of view of the law, Cameron's argument that its employment relationships with its Navajo workers are not consensual is simply wrong.[3] Legal and practical limitations on the employment choices Cameron can make do not, *as a matter of law*, render those choices involuntary or nonconsensual. All consensual relationships, including those entered into through employment contracts, are formed against the backdrop of particular legal rules (including rules prohibiting discrimination) and market conditions (including the composition of the available labor pool). These rules and conditions may limit the range of choices available to contracting parties, but they do not negate the voluntary or consensual nature of otherwise legal contractual relationships.[4] Since Cameron's employment relationships with its Navajo workers *are* consensual, the Navajo Nation's regulation of Cameron's employment practices falls within the first *Montana* exception.

Moreover, the Navajo Nation's exercise of regulatory and adjudicatory jurisdiction over Cameron's employment practices satisfies the nexus requirement recently articulated by the U.S. Supreme Court in *Atkinson v. Shirley*, 532 U.S. 645 (2001). According to *Atkinson*, "*Montana's* consensual relationship exception requires that the... regulation imposed by the Indian tribe have a nexus to the consensual relationship itself." *Id.* at 656. Such a nexus clearly exists here. The regulation at issue is the NPEA, which governs the terms and conditions of *employment* of Navajo workers on the Nation's territory. The relevant consensual relationship is an employment contract between Cameron and its Navajo workers; therefore, the nexus requirement is met.

Significantly, this case is distinguishable from *Montana Department of Transportation v. King*, a recent 9th Circuit Court case in which the court held that absent a state or federal statute or treaty, a tribe does not have jurisdiction to regulate the employment practices of state employees working to maintain a right-of-way through their territory. 191 F.3d 1108 (1999). The issue in *King*

3  We doubt Cameron would have made such an outrageous argument in federal court.

4  Cameron also claims that because its employment relationships with Navajos take the form of verbal, rather than written contracts, those relationships do not fall under *Montana's* consensual relationship exception. This claim is hardly worthy of a response. *Montana* says nothing whatsoever about the form a contractual relationship must take, and employment contracts need not be written in order to be legally enforceable. The fact that Cameron's employment relationships with its Navajo workers are entered into verbally does not negate their contractual nature.

was narrowly limited to whether a tribe has jurisdiction over the employment practices of a state - another sovereign - when the state is engaged in performing one of its sovereign duties, namely the maintenance of the highway. *Id.* at 1114. *King* did not deal with whether a tribe may impose employment regulations on private employers doing work on fee land within a Nation's territory and therefore has no bearing on the case before us.

Finally, the Navajo Nation's exercise of civil jurisdiction over Cameron's employment practices also falls within the second *Montana* exception. *Montana*'s second exception provides that a tribe may exercise civil jurisdiction over "the conduct of non-Indians on fee lands within its territory when that conduct threatens or has some direclt effect on the political integrity, the economic security, or the health or welfare of the tribe." 450 U.S. 544 at 565. Economic security is very much at issue in this case.

We take judicial notice of the fact that Navajo Nation unemployment rates are very high. The Navajo Nation Council enacted the NPEA to ensure the economic growth of the Nation and the economic well being of the Navajo workforce. 15 N.N.C. § 602 (A). Cameron is the major employer in the area surrounding the trading post, with 7% to 13% of the area's Navajo population working for Cameron at any given time. Most families living in the area rely either directly or indirectly on Cameron for their livelihood.[5] Thus, Cameron's employment practices have a great, and potentially devastating, impact upon the welfare of the local community and economy. Therefore, they properly come within the scope of the Navajo Nation's civil authority.

## B. EQUAL PROTECTION

Cameron is once again claiming that the NPEA violates: the right of non-Navajo employees to equal protection. We summarily dismissed this claim in our prior decision because Cameron did not have standing to bring an equal protection action on behalf of hypothetical non-Navajo employee-claimants. Cameron continues to lack standing for this claim, and therefore we uphold our previous dismissal.

Moreover, non-Navajos are entitled to the NPEA's written notification and just cause for termination protections. In *Staff Relief v. Polacca*, we held that "under basic principles of equal protection of law, any person who is injured by a violation of [the] NPEA may file a claim with the Commission." 8 Nav. R. at 65 (Nav. Sup. Ct. 2000). Cameron's claim is therefore moot.

## C. THE ALLOCATION OF THE BURDEN OF PROOF

Our previous holding that the NPEA's allocation of the burden of proof on employers does not violate their right to due process of law is the law of the

5 As we noted in *Manygoats (I),* the population surrounding the Cameron area is predominantly Navajo. According to Census figures available in 1990, there were 1,011 Indians and 24 non-Indians living in the area. 8 Nav. R. at 11.

case. As we explained in *Manygoats (I)*, placing the burden of proof on employer-respondents to show that they had just cause for any adverse action they took against an employee is not only sensible but it is in keeping with the long-standing common law doctrine that the burden of proof ought to rest on the party with peculiar knowledge of the facts and circumstances relevant to determine a disputed element of the case. As the U.S. Supreme Court has noted,

> It is indeed entirely sensible to burden the party more likely to have information relevant to the facts about [the disputed element, such just cause] with the obligation to demonstrate ... the existence or non-existence of the element]. Such was the rule at common law. ...
> "In every case the *onus propandi* [or burden of proof] lies on the party who wishes to support his case by a particular fact which lies more peculiarly within his knowledge, or of which he is supposed to be cognizant."

*Concrete Pipe and Products of California v. Construction Laborers Pension Trust For Southern California*, 508 U.S. 602, 626 (1993) (internal citations omitted). Employer-respondents are simply in a better position to know why they took an adverse action against an employee than is that employee. Therefore, placing the burden of proof on the former to show just cause is neither unfair nor a deprivation of their right to due process.

### D. THE LABOR COMMISSION'S PROCEDURES ON REMAND

Cameron claims that on remand, the Labor Commission violated its right to due process in two distinct ways: (1) by allegedly deciding the case with less than a quorum of Labor Commission members, and (2), by not allowing another evidentiary hearing or additional briefs.

The first claim is obviously without merit. The Navajo Nation Code explicitly provides for a five-member Commission and a quorum of three. 15 N.N.C. §§ 303 & 305(A). The same three Labor Commission members who initially heard the case reviewed the evidence and decided the case on remand. Therefore, the case was decided by a quorum, and Cameron suffered no deprivation of due process in this regard.

The second claim is also without merit. This Court does not disturb the substantive or procedural decisions of a quasi-judicial administrative agency unless those decisions were the result of an abuse of discretion. An abuse of discretion by an agency may consist of an action that is:

> beyond or outside the power of the agency, based upon a mistake as to the applicable law, a violation of civil rights guarantees, not supported by the evidence, or the [result of] procedures [that] were arbitrary and unreasonable.

*Dilcon Navajo Westerner/True Value Store v. Jensen*, 8 Nav. R. 28, 29 (Nav. Sup. Ct. 2000) quoting *Navajo Skill Center v. Benally*, 5 Nav. R. 93, 96 (Nav. sup. Ct. 1986).

The Labor Commission's decision not to hold another hearing or to accept more briefs was neither arbitrary nor unreasonable. We did not give instructions for a new hearing in *Manygoats (I)*, nor was one required given that the original record was extensive and included the transcript of two full days of evidentiary hearings. Moreover, the Navajo Nation Code authorizes and directs the Labor Commission to "[r]eceive, rule on, exclude, and limit evidence, lines of questioning, or testimony which are irrelevant, immaterial, or unduly repetitious." 15 N.N.C. §304(H). Holding another hearing would have been unduly repetitious because Cameron did not claim to have any new evidence to present.

Finally, Cameron had ample incentive to present its strongest case at the initial hearing since it was attempting to meet the 'clear and convincing' standard of proof. Since Cameron had been given a full and fair hearing the first time around, and since Cameron had to meet a lower standard of proof the second time around, the Labor Commission could reasonably have concluded that Cameron would not be disadvantaged by its decision.

We hold that the Labor Commission acted within its discretion in declining to hold additional hearings or to accept additional briefs, and that Cameron suffered no due process violation in this regard.

### E. THE LABOR COMMISSION'S DECISION ON THE MERITS

#### 1. Just Cause

Based on its review of the evidence in the record, the Labor Commission held that Cameron did *not* prove by a preponderance of the evidence that it had just cause to fire Manygoats.

We do not disturb findings of fact unless they are unreasonable. *Silentman v. Pittsburg and Midway Coal Mining Company*, 8 Nav. R. 306, 312 (Nav. Sup. Ct. 2003). Findings of fact are unreasonable if they are not supported by "relevant evidence which a reasonable mind could accept as adequate to support the [factual] conclusion, even if it is possible to draw two inconsistent conclusions from the evidence." *Id.*

The Labor Commission found that only two of the six reasons Cameron cited for its termination of Manygoats in the letter it sent her after she filed her Complaint with the ONLR were supported by sufficient credible evidence. The other four were not. Indeed, the evidence submitted to support them seemed to have been fabricated months *after* Manygoats' termination. We are satisfied that the Commission's findings of fact were not unreasonable.

The Labor Commission also held that although it had found that two reasons of the reasons *were* supported by the evidence, these did not rise to the level of just cause. At the very least, 'just cause' implies that the employer must have fair reasons for taking adverse actions against an employee and that those reasons are supported by the facts of the case." *Dilcon*, 8 Nav. R. at 38. Indeed,

> [n]ot all employee misconduct will meet the standard for just cause...
> The misconduct must be substantial. Thus, a minor neglect of duty,
> an excusable absence, a minor misrepresentation, rudeness, and even
> filing a defamation action against the employer have been held not to
> establish just cause.

Rothstein, et al., 2 Employment Law § 8.8 (2d ed., 2003)(emphasis in original; internal citations omitted). We agree with the Labor Commission's legal conclusion that Cameron did not prove that Manygoats' alleged misconduct was substantial.

However, we note that the Labor Commission was not required even to inquire into whether Cameron proved the six reasons it listed in its belated letter to Manygoats, for "[o]nce the employer has stated reasons for the employment termination, it is bound by them and cannot come forward with new justifications." *Smith v. Red Mesa Unified School District No. 27*, 7 Nav. R. 135, 137 (Nav. Sup. Ct. 1995). Only the first notification counts, both for purposes of determining whether the employer had just cause for the adverse action taken, and for determining the adequacy of the written notification.

Cameron's original notification was written on torn scrap paper and stated only that Manygoats was fired for "violating company policies." Given that Cameron (1) had no formal personnel policies and procedures in place, (2) did not properly document Manygoats' alleged offenses at the time they occurred, and (3) never told Manygloats until after she was fired that she was in violation of company policies, the Labor Commission was reasonable in concluding that Cameron did not show that it had just cause to terminate Manygoats' employment.

### 2. Written Notification

We also affirm the Labor Commission's holding that Cameron did not prove that it gave Manygoats adequate written notification of the reasons for her termination. We previously held that the NPEA' s written notification provision includes the requirement that notice be given *at the time* an employer takes an adverse action against an employee. *See Dilcon*, 8 Nav. R. at 39. Otherwise, there would be nothing to prevent employers from arbitrarily taking adverse actions against their employees, and then making *ad hoc* justifications for those actions after an employee files a complaint. *Red Mesa*, 7 Nav. R. at 137. Therefore, we need only examine Cameron's original notification, which it gave Manygoats on the day of her termination.

Cameron's original notification did not meet the NPEA's requirement that written notification must in all cases cite the cause or specific reasons for the adverse action taken by an employer against an employee. 15 N.N.C. § 604(B)(8). One of the main purposes of the written notification provision is to "inform an individual of the basis for adverse action." *Red Mesa*, 7 Nav. R. at 137. Thus, we have held that:

> [i]n order to ensure that the purposes of the written notification requirement are fulfilled, the notification must be meaningful. Therefore, ...[it] must be reasonably clear in its language and contain facts that would support the adverse action.

*Dilcon*, 8 Nav. R. at 39. This ensures that employees are given the opportunity to decide whether to take appropriate legal action if they feel they have been wronged. In this case, the notice Manygoats received contained no facts that would support her termination. She had to file a complaint with the ONLR to find out why she had been termination.

We affirm the Labor Commission's conclusion that Cameron did not meet its burden of showing either that it had just cause to terminate Manygoats, or that it had given her adequate written notification of the reasons for the termination. Consequently, we also affirm Manygoats' award of back-pay.

### F. ATTORNEYS' FEES AND COSTS

The Labor Commission held that Manygoats was entitled to costs and attorneys' fees. The NPEA require that "[i]f, following notice and hearing, the Commission finds that respondent has violated the Act, the Commission shall ... award costs and attorneys' fees if the respondent's position was not substantially justified." 15 N.N.C. §612(A)(2).

We find that there is ample support in the record for the Labor Commission's determination that Cameron's position was not substantially justified. Cameron's legal arguments were at best misguided, and its evidence ranged from thin to lacking in credibility. Therefore we affirm the Labor Commission's decision to award Manygoats attorneys' fees and costs.

The Labor Commission's Orders are AFFIRMED.