In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

No. 21-1817

LAC COURTE OREILLES BAND OF LAKE SUPERIOR CHIPPEWA INDIANS OF WISCONSIN, *et al.*,

*Plaintiffs-Appellants*,

*v.*

TONY EVERS, *et al.*,

*Defendants-Appellees*.

———————————

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 18-cv-00992 — **James D. Peterson**, *Chief Judge*.

———————————

ARGUED NOVEMBER 8, 2021 — DECIDED AUGUST 15, 2022

———————————

Before SCUDDER, KIRSCH, and JACKSON-AKIWUMI, *Circuit Judges*.

SCUDDER, *Circuit Judge*. Before us is a challenging case involving the taxation of Indian land in Wisconsin. The State has assessed property taxes on lands within four Ojibwe Indian reservations, and the owners of those lands—members of the four Ojibwe Tribes that call those reservations home—would like not to pay them. These tribal landowners have a

bargained-for tax immunity under an 1854 Treaty, still in ef-
fect today, that created the reservations on which they live.
And they have a body of Supreme Court cases recognizing a
categorical presumption against Wisconsin's ability to levy its
taxes absent Congress's say-so—a requirement the State can-
not meet in this case.

As a general matter, the combination of those factors
means that Wisconsin is without power to tax Ojibwe lands
owned by tribal members. This is true even though the parcels
in question are fully alienable, meaning their current owners
can sell them at will—an unusual fact that makes the issue in
this appeal narrow and novel. This case concerns the subset
of tribal lands which, though owned today by Ojibwe tribal
members, were sold by past tribal owners to non-Indians be-
fore coming back into tribal ownership. The State urges
that the one-time act of alienating reservation property to a
non-Indian surrenders the parcel's tax immunity for all time.
As a result, the State says, Ojibwe tribal members who own
such reacquired parcels owe state property taxes, even as
Ojibwe owners of parcels never owned by non-Indians re-
main tax immune.

We conclude otherwise. We therefore reverse the district
court's judgment permitting the State to tax reacquired reser-
vation lands.

## I

On the practical side, the case is straightforward: the State
of Wisconsin and its localities need to know which properties
they may tax. The Tribes say the answer is simple: tax immun-
ity extends to all tribal landowners living on tribal lands, so
the State may tax only those parcels of reservation land

presently owned by non-Indians. The State, for its part, agrees that it may tax reservation lands held by non-Indians, but asserts that it may also tax Ojibwe-owned parcels as long as, at some point in the chain of title, a non-Indian once owned the land in question.

Assessing which side is right requires us to lay a good deal of foundation—both legal and factual.

### A. Legal Background

Indian tribes are "separate sovereigns pre-existing the Constitution," *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 56 (1978), and as such they "exercise inherent sovereign authority over their members and territories." *Okla. Tax Comm'n v. Citizen Band Potawatomi Indian Tribe*, 498 U.S. 505, 509 (1991). So, too, have the tribes "retained" that inherent sovereignty "even after formation of the United States." *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 764 (1985); see also *Denezpi v. United States*, 142 S. Ct. 1838, 1845 (2022) (reaffirming that Indian tribes remain separate sovereigns for purposes of the Double Jeopardy Clause); *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 788 (2015) (recognizing that the tribes enjoy immunity from suit as "a necessary corollary to Indian sovereignty and self-governance") (citation omitted).

Still, there is no denying that our Nation's founding and rapid expansion west changed things for these ancient sovereigns. Lands once controlled exclusively by various Indian tribes are now shared with two other classes of sovereigns: the federal government, for one, and the fifty states, for another. The complex relationship between these three distinct entities is an important part of our history. And the equally

complex body of law that resulted provides most of the framework for resolving this appeal.

## 1. The Tribes and the Federal Government

Start with the federal government. Seeking to craft a coherent nationwide Indian policy, "[t]he Constitution vests the Federal Government with exclusive authority over relations with Indian tribes." *Blackfeet Tribe*, 471 U.S. at 764 (citing U.S. Const. art. I, § 8, cl. 1). In the early days of the republic, the federal government's posture toward the tribes reflected some measure of respect for tribal sovereignty—tribal relations were mostly a matter for the President's Article II treatymaking powers. See U.S. Const., art. II, § 2, cl. 2 ("The President … shall have Power, by and with the Advice and Consent of the Senate, to make Treaties."); see also *United States v. Lara*, 541 U.S. 193, 201 (2004) (explaining that "during the first century of America's national existence … Indian affairs were more an aspect of military and foreign policy than a subject of domestic or municipal law" (citation omitted, alteration in original)). The more than 300 treaties that resulted from these diplomatic efforts, like all treaties, had the full force of federal law upon their ratification by the Senate. See *McGirt v. Oklahoma*, 140 S. Ct. 2452, 2462 (2020) (explaining that Indian treaties are the "supreme Law of the Land" under the Supremacy Clause); 2 Charles Henry Butler, The Treaty-Making Power of the United States § 405 (1902) (canvassing the history of treatymaking with the Indian tribes).

But treatymaking was only one avenue of regulating affairs with the tribes. The Constitution also permits Congress "[t]o regulate Commerce … with the Indian Tribes." U.S. Const. art. I, § 8, cl. 3. The Supreme Court has interpreted that language, the Indian Commerce Clause, as giving Congress

"plenary and exclusive" authority to legislate generally with respect to tribal matters. *Lara*, 541 U.S. at 200 (citations omitted). In exercise of that power Congress has come to "subject[ ] the tribes to substantial bodies of state and federal law." *County of Yakima v. Confederated Tribes & Bands of the Yakima Indian Nation*, 502 U.S. 251, 257 (1992). And it has used that power more generally to "regulate and modify the status of the tribes." *Lara*, 541 U.S. at 200 (quoting William Canby, American Indian Law 2 (3d ed. 1998)).

Eventually Congress's broad Article I powers overcame those of the President under Article II. This became particularly clear when, in 1871, Congress decreed that "[n]o Indian nation or tribe … shall be acknowledged or recognized as an independent nation, tribe, or power with whom the United States may contract by treaty." 25 U.S.C. § 71. This law put an end to all executive treatymaking with the tribes going forward, and in that way further limited the principle of the tribes as independent sovereigns. See, *e.g.*, *Bay Mills Indian Cmty.*, 572 U.S. at 788 (referring to the tribes as "domestic dependent nations" and explaining that "[a]s dependents, the tribes are subject to plenary control by Congress" (cleaned up)). And along those same lines the Supreme Court has since recognized Congress's power to unilaterally modify or even abrogate treaties with the tribes. See *McGirt*, 140 S. Ct. at 2462; *Reich v. Great Lakes Indian Fish & Wildlife Comm'n*, 4 F.3d 490, 493 (7th Cir. 1993).

But even as Congress in 1871 carved a bigger role for itself going forward, it took care to emphasize that existing Indian treaties retained full effect—at least until further notice. See 25 U.S.C. § 71 (providing that "no obligation of any treaty lawfully made and ratified with any such Indian nation or

tribe prior to March 3, 1871, shall be hereby invalidated or impaired"). Unless Congress expressly says otherwise, then, an Indian treaty remains the "supreme Law of the Land." *McGirt*, 140 S. Ct. at 2462 (quoting U.S. Const. art. VI, cl. 2).

The overarching lesson of this first century of Indian relations is that, when it comes to the tribes, what Congress says almost always goes. The plenary nature of Congress's tribal powers, the Supreme Court has emphasized, permits Congress to take actions that lessen tribal sovereignty. See *Lara*, 541 U.S. at 200. But the exclusive nature of those powers ensures that *only* Congress may do so. The key takeaway is the recognition that, "[u]nless and until Congress acts, the tribes retain their historic sovereign authority." *Bay Mills Indian Cmty.*, 572 U.S. at 788 (cleaned up).

### 2.  The Tribes and the States

Then come the states. As the Supreme Court emphasized just this past Term in *Oklahoma v. Castro-Huerta*, the states have important sovereign interests of their own. See 142 S. Ct. 2486, 2493 (2022). Though federal law designates certain lands—including the four reservations at issue in this case— "Indian country," 18 U.S.C. § 1151(a), *Castro-Huerta* clarified that "Indian country is part of the State, not separate from the State." 142 S. Ct. at 2493–94. As a general matter, then, "the Constitution allows a State to exercise jurisdiction in Indian country" as a matter of *its* inherent sovereignty. *Id.* at 2493.

There is a balance to be struck, however. State jurisdiction in Indian country, the Court in *Castro-Huerta* explained, is permissible only so long as "the exercise of state jurisdiction would [not] unlawfully infringe on tribal self-government." *Id.* at 2494. In most cases, determining whether a state law

satisfies this standard—and thus whether the law may be enforced in Indian country—involves weighing "tribal interests, federal interests, and state interests," an approach the Court refers to as *Bracker* balancing. *Id.* at 2501 (citing *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 145 (1980)).

But the Supreme Court has always recognized a class of state laws requiring different treatment—those in which a state levies a tax directly on Indians living in Indian country. The concern warranting the differential treatment is that "the power to tax involves the power to destroy," and, in this context, the destruction would be that of a tribe's inherent sovereignty. *Yakima*, 502 U.S. at 258 (quoting *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 431 (1819)). Recall, though, that only *Congress*—not the states—may act to diminish tribal sovereignty. *Bay Mills Indian Cmty.*, 572 U.S. at 788. All of this explains why, "[i]n the area of state taxation," the Supreme Court has not applied its traditional balancing test but instead consistently adhered to what it has called a "more categorical approach: '[A]bsent cession of jurisdiction or other federal statutes permitting it,' … a State is *without power* to tax reservation lands and reservation Indians." *Yakima*, 502 U.S. at 258 (quoting *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148 (1973)) (emphasis added, other alteration in original).

In assessing the validity of a state tax under this categorical approach, everything begins with an important threshold question. "The initial and frequently dispositive question," the Supreme Court has underscored, "is who bears the legal incidence of the tax." *Okla. Tax Comm'n v. Chickasaw Nation*, 515 U.S. 450, 458 (1995). If a tax falls on a non-Indian, the Court's Indian tax cases indicate, it will be upheld so long as "the balance of federal, state, and tribal interests favors the

State, and federal law is not to the contrary"—an analysis akin to the *Bracker* balancing the Court employs outside the taxation context. *Id.* at 459; see also *Castro-Huerta*, 142 S. Ct. at 2501. A tax that falls on Indians on Indian land, however, is presumptively *invalid* unless Congress has authorized it in "unmistakably clear" terms. *Blackfeet Tribe*, 471 U.S. at 765; see also *Chickasaw Nation*, 515 U.S. at 459 (explaining that state taxation of tribal members on reservations is barred "absent clear congressional authorization"). Under the categorical approach, tribal members in Indian country are "immune from a variety of state taxes, including excise taxes and registration fees, net income taxes, personal property taxes, real property taxes on restricted land, cigarette excise taxes, vendor's license fees, and hunting and fishing licenses." Cohen's Handbook of Federal Indian Law § 8.03[1][b], at 697 & nn.7–14 (Nell Jessup Newton ed., 2012) (collecting cases).

The real property taxes at issue here are likewise subject to analysis under the Court's categorical approach. And we see this framework as deeply rooted in the U.S. Reports, with the Supreme Court establishing and applying it across many cases over many years. To be sure, *Castro-Huerta* shows that the Court continues to define and grapple with questions about the scope of state authority within Indian country more generally. In the context of state taxation of tribal lands, however, the Court has "never wavered" from its commitment to the categorical presumption against state taxing authority. *Blackfeet Tribe*, 471 U.S. at 765. Accordingly, the framework articulated in the Court's sizeable body of Indian tax cases continues to set the terms that guide our analysis of the difficult question before us in this appeal.

### B.  The Ojibwe and the 1854 Treaty

With that legal framework established, we turn to the history of the lands at issue in this case—parcels of land on four Ojibwe reservations in the North Woods of Wisconsin.

The Ojibwe people settled in Wisconsin long ago, migrating west from their homelands at the mouth of the St. Lawrence River to reach the Great Lakes by the early 1600s. Over the next two centuries the Ojibwe came to control vast swaths of land, stretching from Michigan's Upper Peninsula across northern Wisconsin into Minnesota and beyond. This case concerns four bands of Ojibwe Indians whose predecessors settled in the lands around Lake Superior: the Bad River, Lac Courte Oreilles, Lac du Flambeau, and Red Cliff bands, which we collectively call the Tribes.

In time the Lake Superior Ojibwe came face to face with another force making its way west—the United States. American frontiersman (and then the federal government) called them "Chippewa," an anglicized derivative of Ojibwe—drop the "O" to see how—but in this opinion we use the original name, as the Tribes do in their briefing.

In the 1830s, the United States sought control of valuable Ojibwe lands on the shores of Lake Superior. Those efforts succeeded. By two treaties in 1837 and 1842, the Ojibwe ceded essentially all their land in Wisconsin to the United States. See Treaty with the Chippewa, 7 Stat. 536 (July 29, 1837); Treaty with the Chippewa, 7 Stat. 591 (Oct. 4, 1842). But it seems the government induced these cessions by false pretenses. The Ojibwe believed they were "selling the ability to cut pine timber and extract copper and other minerals," but the treaties they signed actually transferred title to their lands outright.

The 1842 Treaty went even further, permitting the Ojibwe to remain on the ceded lands only "until required to remove by the President." 7 Stat. 591, art. 2.

In the late 1840s, President Polk sought to exercise this removal power and force the Ojibwe west out of Wisconsin. The Ojibwe resisted, however, sending delegations to Washington in 1848 and 1849 to seek a "permanent home for each of our Bands forever" on land "covering the graves of our fathers, our sugar orchards, and our rice lakes and rivers, at seven different places now occupied by us as villages." These and other pleas forestalled removal efforts, though the government continued to pursue removal throughout the brief Taylor and Fillmore administrations.

All that changed with President Franklin Pierce's inauguration in 1853. President Pierce appointed as his Commissioner of Indian Affairs a man named George W. Manypenny, who discarded the old policy of removal. Manypenny's reasons were pragmatic: as America continued its rapid push west into "distant possessions," there was nowhere left to remove the Indians to. Cohen § 1.03[6][a], at 60 (citation omitted). And so, Manypenny wrote, it had become "necessary" to settle the tribes "in fixed and permanent [reservations], thereafter not to be disturbed." *Id.* (citation omitted). To lead these efforts with respect to the Lake Superior Ojibwe, Manypenny appointed a negotiator named Henry Gilbert.

With Manypenny and Gilbert at the helm, the Ojibwe sensed an opportunity. In late 1853 an Ojibwe interpreter wrote to Manypenny to express the Tribe's belief that "the perpetuity of our Nation can only be secured by permanent settlements." Gilbert agreed, telling Manypenny that removal was "the great terror of [the Ojibwe's] lives" and urging "that

land should be given them near their present homes." In exchange, Gilbert believed the United States could secure access to valuable iron deposits on Ojibwe land in Minnesota. Eager to obtain these lands, Manypenny directed Gilbert to "accede to their wishes" and grant the Ojibwe the "permanent home" they so desperately sought.

At La Pointe, Wisconsin in 1854, the parties struck a deal. See Treaty with the Chippewa, 10 Stat. 1109 (Sept. 30, 1854). In return for over seven million acres of Ojibwe land in northeast Minnesota, see *id.*, art. 1, the United States "set apart" several tracts of land for Ojibwe use, including the four reservations in northern Wisconsin at the heart of this case—the Bad River, Lac Courte Oreilles, Lac du Flambeau, and Red Cliff reservations. See *id.*, art. 2. Article 11 of the 1854 Treaty made these homes permanent, assuring the Ojibwe that they "shall not be required to remove from the homes hereby set apart for them." *Id.*, art. 11. And upon ratification, this promise, like all others contained in the Treaty, was to "be obligatory on the contracting parties." *Id.*, art. 12.

Article 3 of the Treaty of 1854 is important for our purposes. It authorized the President, "at his discretion," to carve out 80-acre tracts from the Ojibwe reservations to "assign" to individual tribal members for "their separate use"—a process known as allotment. *Id.*, art. 3. The President could attach to these allotments whatever "restrictions of the power of alienation as he may see fit to impose." *Id.* So far as the record reveals, every patent the President issued under Article 3 specified that the allottee "shall not sell, lease, or in any manner alienate, said Tract without the consent of the President." This meant that Ojibwe allottees who sought to sell or otherwise dispose of their allotted parcels had to seek the President's

permission to do so. After that first presidentially approved transfer, however, allotted parcels would become freely alienable, just like any other piece of property in Wisconsin. Every parcel of land at issue in this case has become freely alienable through this process of presidential approval.

### C. The General Allotment Act

The President began allotting Ojibwe lands under Article 3 in the late 1860s, and the process continued well into the early twentieth century. Allotment on these reservations thus coincided with an era of increasing congressional centralization of Indian affairs—a period that began with the 1871 passage of the law ending treatymaking with the tribes and reached its height with the 1887 passage of the General Allotment Act. See 24 Stat. 388 (1887), codified at 25 U.S.C. § 331 *et seq.*

The General Allotment Act adopted a nationwide version of the allotment provisions found in treaties like the 1854 Treaty of La Pointe. Section 1 of the enactment authorized the President to allot lands to individual Indians "in all cases where any tribe or band of Indians has been, or shall hereafter be, located upon any reservation created for their use, either by treaty stipulation or by virtue of an act of Congress or executive order." *Id.* § 1. Parcels allotted under § 1 were held in trust by the United States for 25 years, after which the government would convey title to the allottee "in fee, discharged of said trust and free of all charge or incumbrance whatsoever." *Id.* § 5. Section 6, meanwhile, as amended by the Burke Act of 1906, 34 Stat. 182, provided that upon the expiration of the trust period each "allotee shall have the benefit of and be subject to the laws, both civil and criminal, of the State or Territory in which they may reside." 25 U.S.C. § 349.

Do not let this dense historical account mask the broader takeaway. The objectives of the allotment policy embodied in the General Allotment Act "were simple and clear cut: to extinguish tribal sovereignty, erase reservation boundaries, and force the assimilation of Indians into society at large." *Yakima*, 502 U.S. at 254.

Shortly after the General Allotment Act's passage—and giving effect to the statute's clear purpose—the Supreme Court held that, upon the termination of the statutory trust period, lands allotted under the Act could be taxed by the states, even if still owned by Indians. See *Goudy v. Meath*, 203 U.S. 146, 149 (1906). The Court in *Goudy* relied on both § 5 and § 6 of the General Allotment Act in reaching this conclusion. See *id.* at 149.

Nearly a century later, though, the Court returned to *Goudy* and clarified that "it was the *alienability of the allotted lands*—a consequence produced in these cases not by § 6 of the General Allotment Act, but by § 5—that the Court [in *Goudy*] found of central significance." *Yakima*, 502 U.S. at 263 (emphasis in original). Specifically, it was Congress's decision to make the lands "alienable and encumberable" in § 5, rather than the fact that it subjected allottees to state jurisdiction in § 6, that triggered the taxability of the allotted land. *Id.* at 263–64. Alienability was what most mattered, the Court explained, because "it would seem strange [for Congress] to withdraw [the] protection [of the restriction on alienation] and permit [an] Indian to dispose of his lands as he pleases, while at the same time releasing [the land] from taxation." *Id.* at 263 (quoting *Goudy*, 203 U.S. at 149).

The Court expanded upon that reasoning a few years later in *Cass County v. Leech Lake Band of Chippewa Indians*, 524 U.S.

103 (1998). That case concerned eight parcels of Ojibwe land in Minnesota that, under provisions of the Nelson Act of 1889, Congress sold directly to non-Indian owners. *Id.* at 108 (citing 25 Stat. 642 (1889)). In time the tribe repurchased each of these tracts and claimed they were exempt from state taxes, as they had been before the Nelson Act's passage. *Id.* at 108–09.

Drawing upon *Goudy* and *Yakima*, the Court held the lands taxable. *Id.* at 113. While those cases concerned allotments under the General Allotment Act, the Court saw both decisions as standing for the more general "proposition that when Congress makes reservation lands freely alienable, it is 'unmistakably clear' that Congress intends that land to be taxable by state and local governments." *Id.* (quoting *Yakima*, 502 U.S. at 263). Applying that reasoning resulted in the Court concluding that when Congress passed the Nelson Act and authorized the sale of the eight disputed parcels directly to non-Indian owners—and thus made them freely alienable—"Congress surely intended" the lands to be taxable. *Id.*

The common stitching running through *Goudy*, *Yakima*, and *Cass County* is congressional action. In all three cases, we see the Court's determination that tribal lands were taxable as turning not on the simple fact that they were alienable, but rather on the fact that Congress made them so. Alienability, in short, does not itself license state taxation if "reservation land becomes alienable as a result of a treaty provision or other non-statutory source." Cohen § 8.03[1][c], at 705 n.5. In such cases "Congress simply has not spoken as to whether that land should be taxable," *Keweenaw Bay Indian Cmty. v. Naftaly*, 452 F.3d 514, 533 (6th Cir. 2006), and the state is "without power to tax." *Yakima*, 502 U.S. at 258.

## II

Which brings us back to where we started. When the State of Wisconsin sought to tax Ojibwe-owned properties within the four reservations created in 1854, the Tribes sued to prevent collection of those taxes. On cross-motions for summary judgment, the district court, itself well-informed of the legal and factual background we have laid out to this point, rightly recognized that those principles resolved much of the case in the Tribes' favor.

The district court began by explaining that, under the Supreme Court's categorical approach, the taxes here were permissible only if the State could show either that (1) the Tribes had ceded jurisdiction to the State *or* (2) Congress had expressly authorized the tax. See *Yakima*, 502 U.S. at 258.

At the outset, the district court found that the Ojibwe had not ceded jurisdiction over the four reservations in question. Cession of jurisdiction might be express, or, in rare cases, implied based on equitable considerations. See *City of Sherrill v. Oneida Indian Nation of New York*, 544 U.S. 197, 214–17 (2005) (permitting New York to tax reservation lands reacquired by Oneida Indians after two centuries of absence, during which "New York and its county and municipal units ha[d] continuously governed the territory"). Nothing akin to the Oneida's wholesale abandonment of their reservations occurred here: as far as the record reveals, the Ojibwe maintain a strong and active presence on the four reservations in question in northern Wisconsin.

So the State instead focused its efforts on the second *Yakima* path to taxation: showing that Congress had authorized the taxes. On this score the State anchored much of its position

on the General Allotment Act. For starters the State conceded that Ojibwe lands "allotted by the Treaty of 1854 before February 8, 1887"—the date the Allotment Act took effect—"[are] tax exempt." The categorical rule announced in *Yakima* necessitated that concession, since "a State is without power to tax reservation lands and reservation Indians" absent Congress's approval. *Yakima*, 502 U.S. at 258. But in the State's view, the needed congressional authorization arrived in 1887 in the form of the General Allotment Act. The State contended that any allotments made *after* the Act's passage were necessarily made under its authority and thus fully taxable under the holdings of *Goudy* and *Yakima*.

The district court disagreed. It began by explaining that the 1854 Treaty's promise of permanent homes carried with it a promise that the lands would remain tax free forever. This was so, the court reasoned, because "[t]axation of reservation land implies the government's ability to enforce the tax obligation, by liens, foreclosure, and eviction if necessary," a possibility the court saw as "inconsistent with the permanency promised in the 1854 treaty." Adopting the Sixth Circuit's interpretation of the same Treaty in *Keweenaw Bay Indian Community v. Naftaly*, 452 F.3d 514 (6th Cir. 2006), the district court concluded that the tax immunity of the Ojibwe land in question was a negotiated part of the 1854 Treaty that could be defeated only by an act of Congress expressly permitting taxation.

The district court found no federal statute extinguishing the promises exchanged in the 1854 Treaty of La Pointe. While the General Allotment Act did contain a broad grant of presidential allotment authority as to "any reservation created for [Indian] use," including those created "by treaty," 24 Stat. 388,

§ 1, in the district court's view the Act did not "express any clear intent to roll back treaty rights" under the 1854 Treaty. Congressional practice after the Act's passage supports the notion that the Act was not self-executing—presidential allotment under § 1 typically required the passage of "specific legislation that implemented or sometimes replaced the General Allotment Act." Cohen § 16.03[2][b], at 1073.

Congress took no such action here. Just the opposite: in the years after the General Allotment Act's passage, the district court observed, Congress enacted several statutes expressly recognizing that the 1854 Treaty continued to govern allotment on these reservations. See Act of Feb. 11, 1901, 31 Stat. 766 (providing that allotments on the Ojibwe reservations should remain "subject in all respects, except as to the age and condition of the allottee, to the provisions of the third article of the [1854] treaty"); Act of Feb. 3, 1903, 32 Stat. 795 (same). And every land patent in the record, both before and after 1887, cited the 1854 Treaty rather than the General Allotment Act as its governing authority.

The district court therefore saw no indication that "Congress intended to repudiate any tax immunity that was granted to the tribes in the 1854 treaty." So the court granted a part of the Tribes' motion for summary judgment, concluding that, as a general matter, "Indian-owned real property in the tribes' reservations is not taxable by the state or its municipalities," even though the property is freely alienable. See *Keweenaw Bay Indian Cmty.*, 452 F.3d at 532 n.5 (holding that the State of Michigan could not tax lands allotted by the President under the authority of the 1854 Treaty because no act of Congress was "the source of the alienable character of the property").

To this general rule prohibiting state taxation of Ojibwe-owned reservation lands, however, the district court added an important caveat: Ojibwe-owned reservation property is tax free, the court concluded, only "so long as [it] has remained in Indian ownership since allotment."

Recall that once the President approved an initial sale or transfer under the terms of the 1854 Treaty, allotted parcels became freely alienable. In time, some of these parcels came to be owned by non-Indians, whether as a result of direct sales to non-Indians, title passing to non-Indians under the terms of wills, or otherwise. In the district court, all parties agreed that, during periods of non-Indian ownership, reservation lands were taxable by the State—a straightforward result of the categorical rule applied in Indian tax cases. See *Chickasaw Nation*, 515 U.S. at 458. But the Tribes argued that, once a tribal member repurchased an allotted parcel, it was once again tax-exempt—both because the 1854 Treaty remained in effect and promised as much and because at no point has Congress ever authorized the imposition of taxes on Ojibwe property owned by Ojibwe tribal members.

Relying on the Supreme Court's decision in *Cass County*, the district court disagreed, concluding that "transfer to non-Indian ownership permanently severs the tie between the land and the treaty." So, the district court reasoned, "reservation land is taxable once it passes to non-Indian ownership, even if it subsequently returns to Indian ownership." We are unable to discern from the record on appeal just how many parcels are impacted by this ruling.

It is only this latter conclusion that comes to us on appeal. That is so because the parties have made clear they now agree on everything else. Both in its briefs and again in oral

argument, the State acknowledged that it is not challenging the district court's conclusion that the 1854 Treaty, by promising a permanent home to the Ojibwe, also promised the Tribes immunity from state taxes. Nor has the State appealed the district court's further determinations that the Tribes have not ceded jurisdiction over the lands in question and that Congress has not acted—through the General Allotment Act or any other statute—to authorize taxation or otherwise abrogate any of the Treaty's promises. For our part, we likewise have found no act of Congress authorizing taxation of these lands. So we come to the narrow question before us standing on a good deal of common ground.

The Tribes believe that the extensive points of agreement between the parties resolve the case in their favor. If Congress has not authorized taxation of the lands in question, the Tribes say, the categorical rule applies in full force. Under that rule, "[t]he initial and frequently dispositive question … is who bears the legal incidence of [the] tax." *Chickasaw Nation*, 515 U.S. at 458. And so, the Tribes contend, because the State today seeks to tax tribal lands presently owned by Ojibwe tribal members, the tax is invalid. In the Tribes' view, then, whether a particular property has or has not been owned by a non-Indian in the past is of no legal consequence whatsoever.

The State, meanwhile, says the fact of non-Indian ownership in the chain of title is dispositive of the legal issue before us, resolving the case in their favor. Absent congressional authorization, the State acknowledges that it must point to some other source to support its authority to tax reservation lands held by Ojibwe tribal members. And like the district court, the State would have us find that authority in the act of alienation to a non-Indian owner. In the State's view, a tribal allottee

surrenders the tax immunity of her parcel for all time by transferring it to a non-Indian.

We must decide which side has it right.

## III

This is a peculiar case. No other circuit court has had occasion to consider whether the sale of tax-exempt tribal land to a non-Indian surrenders the land's tax immunity as against all other subsequent tribal owners. Nor do the Supreme Court's cases supply a definitive answer.

In *Cass County*, the Court reinforced the longstanding precept that "when Congress makes reservation lands freely alienable, it is 'unmistakably clear' that Congress intends that land to be taxable by state and local governments." 524 U.S. at 113 (quoting *Yakima*, 502 U.S. at 263). But here everyone agrees that *Congress* never acted to make the Ojibwe lands in question freely alienable. Rather, the land became alienable through the process established in the 1854 Treaty. As the district court explained, "land allotted to Indian ownership under the 1854 treaty *is not taxable, despite being freely alienable*"— a point the State does not challenge and that takes us outside the confines of *Goudy*, *Yakima*, and *Cass County* and into unresolved legal territory. See *Keweenaw Bay Indian Cmty.*, 452 F.3d at 532–33 & n.5 (holding that, when tribal land is "freely alienable not because of an act of Congress, but because of the act of the President as empowered by [a] treaty," it remains tax immune because "Congress simply has not spoken as to whether that land should be taxable").

In this narrow circumstance, then—where the general rule that alienability means taxability *does not apply*—the question is whether the one-time fact of alienation to a non-Indian

renders the reservation land in question taxable as against present (and all future) tribal owners. We believe not.

### A.  Congress Has Not Authorized State Taxation

*Yakima* tells us that there exist two and only two avenues to state taxation of tribal lands: (1) cession of jurisdiction by the tribe or (2) express congressional authorization. See 502 U.S. at 258. The district court concluded—and the State now concedes—that neither condition is satisfied: the Tribes retain jurisdiction over their reservations, and Congress has not authorized state taxation on those reservations.

Yet the district court saw *Cass County* as adding a third path to state taxation. It got there by first observing, as everyone agrees, that reservation lands are taxable when owned by non-Indians. See *Chickasaw Nation*, 515 U.S. at 459 (explaining that "if the legal incidence of the tax rests on non-Indians, no categorical bar prevents enforcement of the tax"). In the district court's view, once the land became taxable in the hands of that first non-Indian owner, *Cass County* compelled the conclusion that the parcel could not return to tax-exempt status upon its reacquisition by an Ojibwe tribal member.

The tribe in *Cass County* had suggested that "although its tax immunity lay dormant during the period when the eight parcels were held by non-Indians, its reacquisition of the lands in fee rendered them nontaxable once again." 524 U.S. at 113–14. The Court rejected this theory, holding that "once Congress has demonstrated (as it has here [through the passage of the Nelson Act]) a clear intent to subject the land to taxation by making it alienable, Congress must make an unmistakably clear statement in order to render it nontaxable." *Id.* at 114. The district court read this portion of *Cass County* as

establishing a general rule against the reawakening of "dormant" tribal tax immunity.

We view the analysis differently. In *Cass County*, as the language just quoted makes clear, *Congress itself*—through the Nelson Act—initiated the sale of the eight disputed parcels to non-Indian owners. See *id.* at 108. That express statutory authorization made clear Congress's intent for the lands to be freely alienable and thus fully taxable under the longstanding holdings of *Goudy* and *Yakima*. See *id.* at 113. And so the *Cass County* tribe's argument that its "tax immunity lay dormant during the period when the eight parcels were held by non-Indians" made little sense: there was no tax immunity to revive, because by passing the Nelson Act "*Congress* ha[d] demonstrated … a clear intent to subject the land to taxation." *Id.* at 113–14 (emphasis added). The Nelson Act, in short, permanently extinguished the land's tax immunity the moment the President signed the statute into law—regardless of who actually owned the land thereafter. And it was that reality, the Court emphasized, that exposed the error in the tribe's idea that the tax immunity had only lain dormant during the period of non-Indian ownership.

But the Ojibwe lands in this case have never become alienable at Congress's behest. Congress has never extinguished their tax immunity. As the district court explained, it was the 1854 Treaty—not the General Allotment Act or any other act of Congress—that governed allotment of the lands here. "A treaty is in its nature a contract between … nations, not a legislative act," and the State again concedes the point. *Lozano v. Montoya Alvarez*, 572 U.S. 1, 12 (2014) (alteration in original) (quoting *Foster v. Neilson*, 27 U.S. (2 Pet.) 253, 314 (1829)); see also *Lara*, 541 U.S. at 201 (explaining that the Treaty Clause of

Article II, § 2, cl. 2 "authoriz[es] the President, not Congress, 'to make Treaties'"). Accordingly, lands allotted under the 1854 Treaty became freely alienable by mutual assent of the contracting parties—the Ojibwe tribes and the President of the United States—without Congress's input one way or the other. See *Keweenaw Bay Indian Cmty.*, 452 F.3d at 530 (concluding that "[a] treaty is not a federal statute or an act of Congress" for purposes of the *Yakima* analysis).

In the final analysis, that distinction makes all the difference. We agree with the district court that *Cass County* applied a categorical rule—just not a new one saying that the sale of tribal land to non-Indians surrenders its tax immunity forever. Instead, we see the case as an application of the settled rule from *Goudy* and *Yakima* that when Congress "render[s] … allotted lands alienable and encumberable, it also render[s] them subject to assessment and forced sale for taxes." *Yakima*, 502 U.S. at 263–64. And "once Congress has demonstrated … a clear intent to subject the land to taxation by making it alienable, Congress must make an unmistakably clear statement in order to render it nontaxable" once again. *Cass County*, 524 U.S. at 114. In this light, it is easy to see why "[t]he subsequent repurchase of reservation lands by [the] tribe" in *Cass County* did not reinstate tax immunity—the repurchase of reservation lands on the free market by tribal members could not possibly "manifest any congressional intent to reassume federal protection of that land and to oust state taxing authority." *Id.*

At bottom, *Cass County* applies and reinforces *Yakima*'s teachings about Congress's central role in determining whether a state may tax tribal lands. And once we return to the parties' acknowledgment that Congress has not

authorized taxation of the Ojibwe reservation lands at issue here, we are again back to the beginning of the analysis—with *Yakima*'s two avenues closed.

### B. The Supreme Court's Cases Do Not Support the State's Surrender-of-Tax-Immunity Theory

To its credit, the State seems to recognize that *Cass County* alone cannot support its position that "reservation land becomes taxable when it is actually alienated to non-Indians, independent of any actions of Congress." The State instead roots its argument in two cases—*Montana v. United States*, 450 U.S. 544 (1981), and *Brendale v. Confederated Tribes & Bands of Yakima Indian Nation*, 492 U.S. 408 (1989)—addressing tribal regulatory jurisdiction over non-Indians living on reservation lands. On the State's reading, these decisions, although not themselves part of the Supreme Court's tax-immunity precedents, announce a rule of forfeiture or surrender of tax immunity by making plain that when reservation land passes into unrestricted fee ownership by non-Indians, it ceases to be set aside by federal law for exclusive Indian use and occupation, thereby removing any legal obstacle to state taxation.

We are not persuaded. In *Montana*, the 1868 Fort Laramie Treaty gave the Crow Indians "absolute and undisturbed use and occupation" of their reservation, though the reservation later became subject to allotment under the General Allotment Act. 450 U.S. at 558 (quoting 15 Stat. 649). The question before the Supreme Court was whether the Crows could regulate hunting and fishing activities on allotted parcels of reservation land by then owned by non-Indians. See *id.* at 547.

The Court held that they could not. The tribe's plenary regulatory authority, the Court explained, extended only to

portions of the reservation that remained in their "absolute and undisturbed use and occupation." *Id.* at 559. "[T]he quantity of such land," the Court continued, "was substantially reduced by the allotment and alienation of tribal lands as a result of [Congress's] passage of the General Allotment Act." *Id.* Relying on its earlier decision in *Puyallup Tribe v. Washington Game Department*, the Court observed that "treaty rights with respect to reservation lands must be read in light of the subsequent alienation of those lands." *Id.* at 560 (citing 433 U.S. 165, 174 (1977)). Given that Congress initiated the allotment and sale of tribal lands by enacting the General Allotment Act, the Court concluded that the 1868 treaty "provide[d] no support for tribal authority to regulate hunting and fishing on land owned by non-Indians." *Id.* at 561.

A few years later the Court confronted a similar question in *Brendale*. The Yakima Nation sought to exercise zoning authority over reservation lands now owned—again after Congress authorized allotment and alienation under the General Allotment Act—by non-Indians. See 492 U.S. at 414. In a plurality opinion, four Justices reasoned that, because "the Yakima Nation no longer has the power to exclude [non-Indian] fee owners from its land within the boundaries of the reservation," the tribe could no longer exercise "the lesser included power" of zoning that land. *Id.* at 424. But the history of the Yakima reservation, the details of which we need not discuss, led to a fractured decision, with the Court permitting the tribe to zone some lands but not others. See *id.* at 432–33. Still, a majority of Justices agreed that, at least in some cases, a tribe may lose its authority to regulate non-Indians living on reservation lands. See *id.* at 433 (Stevens, J., announcing the judgment in part and concurring in the judgment in part) (concluding that tribal zoning authority "depends on the extent to

which the Tribe's virtually absolute power to exclude has been either diminished by federal statute or voluntarily surrendered by the Tribe itself").

The State contends that the "diminution of tribal authority over alienated reservation land" discussed in *Montana* and *Brendale* "is necessarily a surrender of the tax exemption attached to the land prior to its alienation." But the State does not explain why this is "necessarily" so, and we find this conclusory assertion unavailing.

No doubt *Montana* and *Brendale* are important, as they address the recurring questions over the scope of tribal authority to regulate the conduct of non-Indians who own reservation lands outright. But as the Court in *Montana* explained, as a general matter "the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe." 450 U.S. at 565. A tribe's diminished capacity to regulate reservation lands owned by non-Indians—the result in *Montana* and *Brendale*—reflects a straightforward extension of that general rule.

That is especially so given *how* the lands in the two cases came to be owned by non-Indians—both *Montana* and *Brendale* involved allotments under the General Allotment Act, an enactment the Court has recognized sought to "extinguish tribal sovereignty, erase reservation boundaries, and force the assimilation of Indians into the society at large." *Yakima*, 502 U.S. at 254. In view of this clear congressional purpose, the *Montana* Court determined that it would "def[y] common sense to suppose that Congress would intend that non-Indians purchasing allotted lands would become subject to tribal jurisdiction when an avowed purpose of the allotment policy was the ultimate destruction of tribal government." 450 U.S.

at 559 n.9. This same point explains why the *Brendale* plurality saw *Montana* as a case about "*the effect of the Allotment Act* on an Indian tribe's treaty rights to regulate activities of non-members on [reservation] fee land." 492 U.S. at 422–23 (emphasis added).

But the case before us is not about tribal regulation of non-Indians. Nor, as we have underscored, does the General Allotment Act apply to the Ojibwe lands in question—a conclusion the State does not challenge on appeal. Both differences matter. The presumption against tribal jurisdiction to regulate non-Indians, see *Montana*, 450 U.S. at 565, is paralleled by a different, deep-seated presumption in the Supreme Court's case law—*Goudy* and *Yakima*'s rule that "absent cession of jurisdiction or other federal statutes permitting it, a State is without power to tax reservation lands and reservation Indians." *Yakima*, 502 U.S. at 258 (cleaned up). The presumption here thus runs in the Ojibwe's favor and, unlike in *Montana* and *Brendale*, Congress has not acted (through the General Allotment Act or otherwise) to unsettle that presumption.

To our mind, the State's argument finds better support in *Puyallup*, which the Supreme Court discussed in *Montana*. There, Congress had passed two statutes under which "the Puyallups alienated, in fee simple absolute, all but 22 acres of their 18,000-acre reservation." 433 U.S. at 174. The Puyallups nevertheless claimed a treaty-based right to fish for steelhead free from state regulation in a river located entirely within the since-alienated portion of the reservation. *Id.* In the Court's view this interpretation would have "clashe[d] with the subsequent history of the reservation." *Id.* So it held that while the Puyallups were still entitled to fish reservation waters,

their right to do so was subject to state regulatory authority. *Id.* at 174–75 & n.13.

*Puyallup* involved not a tribe's attempt to regulate non-Indians, but a tribe's attempt to evade state regulatory jurisdiction on reservation lands held by non-Indians, and so is much closer to our case than *Montana* or *Brendale*. Three key differences stand out, though, and each is of legal and factual significance.

*First*, in *Puyallup* the Court was careful to observe that it was Congress's express approval that led to the sale of reservation lands to non-Indians—a crucial legal factor missing here. See *id.* at 174. *Second*, and just as important in our view, is the nature of the state regulation in question. State fishing regulations are subject to traditional *Bracker* balancing analysis, in which a court must "balance federal, state, and tribal interests … in assessing [the validity of] state regulation." *Chickasaw Nation*, 515 U.S. at 458; see *Castro-Huerta*, 142 S. Ct. at 2501. State taxation of Indians on tribal lands, however, is categorically prohibited absent clear congressional authorization. See *Yakima*, 502 U.S. at 258. So even assuming *Puyallup* can be read to suggest that the sale of reservation lands to non-Indians (in the absence of congressional action) forfeits tribal immunity from *some* state regulation, we see no indication that it should be read to encompass a surrender of *tax* immunity, which the Supreme Court has always viewed as different in kind.

All of this leads us, *third*, to a broader reason to reject the application of *Montana*, *Brendale*, and *Puyallup* to the taxation challenged here. Go back to the Court's categorical approach and remember that the threshold question courts must ask is "who bears the legal incidence of a tax." *Chickasaw Nation*, 515

U.S. at 458. What that formulation makes clear is that the relevant inquiry occurs in the present tense: who bears the legal incidence of the tax *today*? In our case, all the relevant parcels of tribal land are presently held by Ojibwe tribal members. Each of the cases in the *Montana* line, however, involved reservation lands owned at the time by non-Indians. The cases thus say nothing about what would happen to the lands were they to be reacquired by the tribes.

And that final difference leaves us assured that *Montana*'s teaching that "treaty rights with respect to reservation lands must be read in light of the subsequent alienation of those lands," 450 U.S. at 560, is not as broad as the State would have it. These three cases do not concern the one treaty right on the sanctity of which the Court has "never wavered"—tribal tax immunity. *Blackfeet Tribe*, 471 U.S. at 765. They do not concern lands held at the time by tribal owners. And the subsequent alienation of which they speak was initiated, in each case, by Congress.

At bottom, then, we see the best course of reasoning here as one hewing to the Supreme Court's many Indian taxation cases and, more specifically, its teachings in the tribal tax immunity area. And so again we return to the starting line—with the State unable to justify its taxes under the test set out in *Yakima*.

## IV

To this point, we have said little about the document that created and that lies in the background of this case—the Treaty of La Pointe. Everyone agrees that, since Congress has never said otherwise, that Treaty remains the "supreme Law of the Land." *McGirt*, 140 S. Ct. at 2462 (quoting U.S. Const.

art. VI, cl. 2); see also 25 U.S.C. § 71 (affirming the continued validity of "any treaty lawfully made and ratified with any … Indian nation or tribe prior to March 3, 1871"). And a close look at the specific promises contained in the 1854 Treaty leaves us especially loathe to recognize the surrender-of-tax-immunity theory advocated by the State.

In response to "the great terror" that motivated the tribal signatories, Article 11 of the 1854 Treaty provided that "the Indians shall not be required to remove from the homes hereby set apart for them." 10 Stat. 1109, art. 11. On appeal the State now agrees that this promise of permanent homes included within it an assurance of immunity from state taxation—one that reinforces the ordinary common-law immunity enjoyed by all Indian tribes. See *Yakima*, 502 U.S. at 258.

But the Tribes say the Treaty goes further and confers tax immunity broad enough to encompass even reacquired reservation lands. Recognize the consequences of accepting this view: if the 1854 Treaty's promise of tax immunity covers even the reacquired lands at issue here, then only Congress could break that promise. See *McGirt*, 140 S. Ct. at 2462. And Congress, we know, has not done so. For that reason, even if the State is right that extending the reasoning of *Montana* would normally render reacquired lands taxable, the unbroken promise of the 1854 Treaty would supersede that common-law holding. Put another way, the Tribes say, the parties to the Treaty of La Pointe contracted around any common-law rule of surrender recognized in *Montana*.

The position has force. Article 11's reference to "homes," the district court rightly determined, encompasses all lands within the borders of the Article 2 reservations, regardless of whether the President eventually allotted them under

Article 3. From there it follows that allotted lands remain "homes" within the meaning of the Treaty even if they came at some point to be owned by non-Indians. The lands remain "set apart" for the Ojibwe for purposes of federal law. See 10 Stat. 1109, art. 2; 18 U.S.C. § 1151(a). As the Supreme Court has explained, allotment—and the influx of non-Indian ownership that comes with it—"is completely consistent with continued reservation status." *Mattz v. Arnett*, 412 U.S. 481, 497 (1973); see also *McGirt*, 140 S. Ct. at 2464 (explaining that "Congress does not disestablish a reservation simply by allowing the transfer of individual plots, whether to Native Americans or others"). Put most simply, *all* of the lands on the Ojibwe reservations in this case remain their "home" despite their temporary alienation to non-Indians. Nothing in the record reflects anything close to the sort of out-and-out abandonment of a reservation that might lead us to conclude otherwise. See *City of Sherrill*, 544 U.S. at 214–17. So while the Tribes here may have let outsiders onto their lands, they have not in any sense given up their ancestral homes. And so, because the State levying taxes on an Ojibwe owner of reacquired land may lead to her "be[ing] required to remove from [her] home[ ]," the 1854 Treaty forbids it. 10 Stat. 1109, art. 11.

The State sees this reading of the Treaty as at odds with itself. According to the State, if the Treaty forbids taxation of reacquired lands, it "necessarily follow[s] that *all* land on those reservations—including land owned by non-Indians—must be non-taxable," which contradicts the Tribes' admission that the State may tax reservation lands during periods of non-Indian ownership. Once again the State has not explained why this is "necessarily" so, and we do not think it is. States may generally tax non-Indians on reservation lands, but they may not tax Indians without congressional

authorization. That is the very essence of the categorical rule employed in the Supreme Court's Indian tax cases. See Cohen § 8.03[1][b], at 697 (collecting cases).

Nor is this sort of distinction particularly unusual in tax law. Wisconsin exempts religious organizations from property taxes. See, *e.g.*, Wis. Stat. § 70.11(4). This, too, is a categorical rule based on the identity of the owner (a religious organization) and the use to which the property is put (religious uses or housing for certain religious leaders). If a church sells its minister's quarters to a secular bookstore, the land becomes taxable. See, *e.g.*, *Wauwatosa Ave. United Methodist Church v. City of Wauwatosa*, 776 N.W.2d 280, 282–83 (Wis. Ct. App. 2009). But if the church reacquires the space and resumes using it for religious purposes, the church's exemption returns in full force. So too here on the Tribes' reading. That result is neither absurd nor internally inconsistent.

And that observation brings us back to the State's invocation of *Montana*. The Supreme Court there made clear that "treaty rights with respect to reservation lands must be read in light of the subsequent alienation of those lands"—particularly when the alienation in question was initiated by Congress itself. 450 U.S. at 561. But if the 1854 Treaty contains a promise that tribal tax immunity survives temporary periods of non-Indian ownership, then reading that promise in light of the alienation the document itself contemplates only confirms our earlier conclusion: because Congress has not said otherwise, there is no basis for the State's authority to tax Ojibwe reservation lands.

## V

Had Congress enacted the text of the 1854 Treaty in the form of a statute, all the lands in question would be fully taxable under the reasoning of *Yakima*. In this sense the distinction the Supreme Court's cases have drawn here—between congressionally authorized alienability (which renders lands taxable) and alienation in fact (which does not)—might seem needlessly formalistic and leading to an odd practical result.

No doubt the distinction is formalistic, but not needlessly so. The Constitution makes clear that Congress alone may diminish the inherent sovereignty of the Indian tribes, particularly where taxes are concerned. Here, Congress has not authorized the State to tax Ojibwe lands. The 1854 Treaty, in light of the historical evidence in the record, is best read to promise tax immunity for even reacquired lands. And the State's surrender theory is premised on cases (*Montana* and *Brendale*, in particular) arising in a context wholly divorced from the unique realm of state taxation of Indians on Indian reservations. All of that brings us back to what the Supreme Court has called "[t]he initial and frequently dispositive question in Indian tax cases"—"who bears the legal incidence of [the] tax"? *Chickasaw Nation*, 515 U.S. at 458.

The State of Wisconsin and its localities seek to tax Ojibwe tribal members who own Ojibwe reservation lands. We hold that they may not do so.

The district court's judgment to the contrary is REVERSED.